UNITED STATES, Appellee

v

THOMAS C. O'SUCH, JR., Sergeant, U. S. Marine Corps, Appellant

16 USCMA 537, 37 CMR 157

538

*Fred W. Shields, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Commander George A. Williams,* USN, *Major Ernest B. Wright,* USMC, and *Major Brian Kent,* USMC.

*Commander Walter F. Brown,* USN, argued the cause for Appellee, United States.

## Opinion of the Court

FERGUSON, Judge:

Convicted of premeditated murder, in violation of Uniform Code of Military Justice, Article 118, 10 USC § 918, the accused was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for life, and reduction. On his appeal, this Court granted his petition for review upon the following issues:

1. WHETHER THE EVIDENCE IS SUFFICIENT TO ESTABLISH ACCUSED'S GUILT OF PREMEDITATED MURDER.

2. WHETHER THE BOARD OF REVIEW CORRECTLY FOUND ACCUSED HAD MADE ORAL ADMISSIONS OF HIS GUILT AND, IF SO, WHETHER SUCH WERE VOLUNTARY.

3. WHETHER ACCUSED WAS DEPRIVED OF HIS RIGHT TO COUNSEL, THE INVESTIGATION INVOLVING HIM HAVING REACHED AN ACCUSATORY STAGE.[1]

### I

On the morning of June 16, 1963, Sergeant Michael W. Stack was found dead near Koza City, Okinawa. Death resulted from injuries which he suffered as a result of three gunshot wounds, two of which were fired into his back. These were inflicted by a .45 caliber automatic pistol. The evidence tended to indicate the homicide occurred at approximately 11:15 p.m. on June 15, 1963.

Stack was last seen with the accused on the evening of June 15. The

---

[1] In light of our disposition of the case, it is unnecessary to consider this issue.

weapon with which Stack was slain was found in accused's place of duty, in a safe to which he had access. It was also shown that accused had previously sought to obtain another barrel for a .45 caliber automatic pistol and had possession of proper ammunition prior to the slaying. More significantly, the deceased's identification card and liberty card were found concealed in the office in which accused worked, and, upon his arrest as a suspect, a promissory note made in deceased's favor was found in his wallet. It was due on June 25, 1963, along with a large amount of interest. Finally, it was shown by expert testimony that accused's shoes bore bloodstains of the same type as the victim's.

In addition, evidence was received that accused, subsequent to his apprehension, admitted killing Sergeant Stack.

### II

Appellate defense counsel urge the foregoing evidence is insufficient to establish accused's guilt of premeditated murder. In so contending, reference is made to conflicts in the evidence and attacks leveled at the credibility of witnesses. But these are matters of no concern to us in measuring the *legal* sufficiency of the proof. United States v McCrary, 1 USCMA 1, 1 CMR 1; United States v Brand, 10 USCMA 437, 28 CMR 3. We view the evidence as a matter of law and, so examining it, conclude it is sufficient to have permitted the court to find accused guilty as charged. United

States v Marymont, 11 USCMA 745, 29 CMR 561; United States v Snook, 12 USCMA 613, 31 CMR 199.

In like manner, we dispose of the argument the record does not establish accused made oral ad- ██ missions of his guilt. To the contrary, it affirmatively demonstrates he admitted killing the deceased. We are not free to disregard that testimony or to hold the board of review erred in refusing to ignore it. Again, whether such admissions were in fact made was one of credibility to be resolved below and may not be disturbed here. United States v McCrary, supra; cf. United States v Ledlow, 11 USCMA 659, 29 CMR 475.

### III

We turn, therefore, to the remaining question before us, which inquires whether accused's pretrial statements were voluntarily obtained. A depiction of the shocking facts surrounding accused's interrogation is essential to establish the reasons for our conclusion his statements were coerced and, hence, as a matter of law, inadmissible in evidence against him.

During the day of June 16, accused was briefly interviewed by criminal investigators concerning his connection with the deceased on the previous evening and released. Other evidence came to their attention, and he was apprehended at approximately 7:15 p.m. in his barracks. A search of his locker was conducted, and a pair of shoes were seized. He was taken to the military police office, handcuffed, and thence transported to an Army Criminal Investigations Detachment office. There, accused was interrogated until approximately 4:00 a.m. on June 17. He was then escorted to a local "crime lab," where material was apparently obtained from his skin for various tests. Thereafter, he was redelivered to his unit. The balance of the day was apparently spent in processing O'Such for confinement in the Joint Services Stockade. Authorities there, however, refused to accept him.

At approximately 4:00 p.m., he was delivered to the Camp Butler Brig for confinement. There, accused was deprived of all his personal effects, issued a helmet, fatigue clothing and underwear, and marched back to the brig's segregation cells.

O'Such was then stripped of all clothing except his underwear and confined "in a box more or less." This cell, normally used for the punishment of recalcitrant prisoners, was approximately seven feet, five inches in depth and four feet, ten inches wide. It had a sloping ceiling varying in height from eight feet in the front to seven feet, six inches in the rear. It was constructed of concrete block on all four sides. At the rear, high on the wall, was a small ventilation slit, hooded to prevent the admission of light. Its door was of solid construction and contained an additional ventilation slit and a screened opening through which the cell's inhabitant might be viewed. Both these openings were also hooded to prevent the admission of light.

The cell's sole furniture consisted of a wooden board, seventy-six inches long and thirty inches in width. It was realistically portrayed by one witness as "a section . . . out of a bowling alley. Actually it was a hard chunk of wood." At night, however, accused was furnished with only a thin mattress on which to sleep. He had no other bedding or covering. In short, the facilities were those used by the brig for the punishment in solitary confinement of prisoners violating prison regulations.[2]

A special guard post was mounted outside accused's cell. Personnel manning it were instructed to observe the accused at all times. During the day, he was to be watched constantly through the door grating. At night, a flashlight was to be played on him at five minute intervals, by sliding open the hooded screen. The discipline maintained over the accused was identical to that inflicted as a penal measure on one in solitary confinement.

[2] Pictures of a scale model of the cell produced at the trial as well as photographs of its actual interior are appended.

Thus, for the relevant period, he was deprived of clothing, writing materials, reading materials, and his smoking severely limited. In addition, he was not permitted to lie down on his slab between reveille and retreat.

The accused remained confined under these conditions until June 18. At the trial, he testified that, while he attempted to obtain rest during this period, he was not permitted to do so in the daytime and could not do so at night, due to the noise and light involved in the five-minute checks. He also complained, albeit less stringently, of the cold food furnished him, and the indignities inherent in the conditions under which he was held.

On the evening of June 18, he was released from the "black box" and returned to the custody of criminal investigators and counterintelligence agents. He was once more interrogated until approximately 11:45 p.m., with, however, occasional breaks being taken. During this period, accused made several statements, some of which indicated he was present during the slaying of Stack and that espionage was involved. On occasions when he stated that he did not wish to speak further out of fear of reprisal against himself or his family, he was promised protection. When he nevertheless persisted in his silence, he was threatened with exposure of his family to danger through arrest of one of his alleged contacts—ostensibly on the basis of information which he had furnished. He was also informed that his refusal to make further statements constituted the offense of misprision of a felony, subjecting him to punishment by court-martial.[3] Finally, during the last break in interrogation, one of the agents approached O'Such and suddenly accused him of murdering Stack. Accused as suddenly admitted he was responsible and had killed the victim.

---

[3] These facts are not controverted, nor could they be, as they are present in a tape recording of this interrogation produced in court upon motion of the defense. The most striking statements are those referring to the threat to his family:

"Q: All right. Now if I go out and pick one of these people up and I don't pick the rest of them up then what you say might happen happen. Mighten it? And I might just decide to go down and pick one of them tonight just to try and see. I'll guarantee. if you don't start telling me some facts and tell Jim some facts I'm going to start picking them up one at a time because I don't have any reason to pick them all up at one time. Now, if you think this will happen because one person is picked up then rest assured it may happen because if I don't get what I want from you then I'm going to get it someplace else. And if it requires going out and picking up one at a time, then I'm going out and pick up one at a time, or Jim is going to pick up one at a time. Is that what you want?

"M: Let's look at it this way. We don't have to let anyone know you've said anything to us. We don't have to let anyone know you've said anything to us until we pick them all up . . . until we scoop them all up in one batch. We are not compelled to say anything, because we're protecting you. My interest is to protect you. If this is in fact what you're afraid of. That's also gunner Harris', but we can't protect you unless we know. As he said, we've got names. We could pick part of them up.

"Q: We talked about this thing once and you brought out what harm it could do you. Is that not true? ooooooooooo Can you not? O'Such? Now, if you're trying to protect your family you will want them picked up at once. Is this true?

. . . . .

"Q: I don't expect you to. I don't expect you to at all. O'Such, all I expect you to do is give us the names of the people who you're involved with. The people who told you to get the weapon ooooooooooo. O'Such, all your [sic] doing so far is trying to provide an alibi for yourself. If you were really interested in your family and their welfare, son, you'd be talking ooooo Now if you're in this category, I would suggest that you start talking. What do you think O'Such?"

**541**

Thereafter, interrogation was resumed, but almost immediately terminated when accused expressed a desire to consult with counsel. He was returned to his cell. Several days later, through intervention of his counsel, he was furnished with a cot, clothing, and the strictures theretofore placed on him considerably relaxed.

Agents admitted accused appeared tired throughout his interrogation. Indeed, Sergeant Morrow, who actually obtained his oral confession, when asked why accused had not been questioned earlier during the day, candidly replied:

"A: Well, he had been up for about two days and two nights and also we had several things that we had to check out before we could question him."

The accused, queried as to his condition, at the time of his confession, declared:

"About the time, sir, from lack of sleep and physical exhaustion, myself from the manner of having a matter like this resting on me and having to go through this interrogation. I folded or something . . . I don't know."

The Government, pointing to evidence of breaks in the period of interrogation; proof that the accused at night was at least lying down with his eyes closed during some of his confinement; that he was furnished food regularly; that, on one occasion, he agreed to continuation of interrogation when asked if he desired it terminated; and that his clothing during his incarceration was adequate for the Okinawan climate, urges the record presents substantial evidence to support the decision of the law officer and the court-martial that the statements were voluntarily made. On the other hand, the defense insists accused's confinement and interrogation are such as to invalidate any statement he may have made. An examination of the total record causes us to conclude that, under the circumstances of this case, accused's statements were involuntarily made

and thus improperly received in evidence against him. See Jordan v Fitzharris, 257 F Supp 674 (ND Cal) (1966).

First, accused, after interrogation throughout the night of June 16 and processing throughout the day of June 17, was subjected to confinement conditions bespeaking a brutality completely at odds with any civilized notion of treatment of a suspect held pending trial. His tiny cell was so constructed that he was denied even light. His bed was a plank; his bedding a thin pallet; and his uniform a set of underwear. Before us, the Government has conceded these accommodations were identical to those involved in United States v West, 12 USCMA 670, 31 CMR 256. There, we expressly condemned them as coercive in nature and "the unmistakable indicia of a return in one jurisdiction to those practices which led to the Code's enactment." United States v West, supra, at page 675.

Moreover, the record reflects accused was accorded the same sort of punitive confinement as if he had committed an infraction of brig regulations and had been duly sentenced therefor, when in fact his conduct throughout his detention was unexceptionable. Such treatment is expressly forbidden by the Code. United States v West, supra. Thus, Code, supra, Article 13, 10 USC § 813, provides:

"Subject to section 857 of this title (article 57), no person, while being held for trial or the result of trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances require to insure his presence, but he may be subjected to minor punishment during that period for infractions of discipline."

In United States v Bayhand, 6

USCMA 762, 21 CMR 84, we declared, at page 768:

"From the foregoing, the conclusion is inescapable that Congress, the framers of the Manuals for Courts-Martial, and the Army must have recognized that gross injustices might result from any confinement system in which one accused of crime was treated no better than one proved guilty. Therefore, to eliminate any and all forms of punishment prior to trial, except that which is inherent in all confinement, laws and regulations were enacted to protect the untried confinee. It must be remembered that the only valid ground for ordering confinement prior to trial is to insure the continued presence of the accused, as where he has earlier indicated that his obligation to remain with his unit weighs lightly with him, or where the seriousness of the offense alleged is likely to tempt him to take leave of his surroundings."

And, speaking of our decision in *Bayhand,* supra, we added in United States v West, supra, at page 673:

"If an accused should not be confined except upon these 'valid grounds,' then *a fortiori,* the limitation upon his freedom of action should not extend to punishment which is not only unauthorized but, indeed, forbidden to be adjudged by courts-martial."

We are, however, most directly concerned with accused's confinement as it bore upon the voluntariness of his statements. Here, the record reflects that the discipline imposed upon him served to deprive him of rest and sleep until his interrogators successfully attained the desired information. Thus, not only was he confined in the "black box" under the squalid conditions outlined above, but he was, at five-minute intervals, subjected to having his cell-door grating opened and a flashlight played upon him. And, from reveille to retreat, he was not permitted to lie down, under punitive rules applied normally to prisoners held in solitary confinement. It was with frankness that one of his questioners disclosed his knowledge that O'Such "had been up for about two days and two nights." And it is small wonder accused testified he was led to speak from lack of sleep and physical exhaustion.

The test of the voluntariness of a confession is whether accused, at the time it was made, possessed the mental freedom to speak or remain silent. United States v Monge, 1 USCMA 95, 2 CMR 1; United States v Colbert, 2 USCMA 3, 6 CMR 3. The matter in issue is not the tendency of measures taken by the Government to cause a false statement to be obtained, but whether they are consistent with constitutional due process. United States v Monge, supra; United States v Askew, 14 USCMA 257, 34 CMR 37. In Rogers v Richmond, 365 US 534, 5 L ed 2d 760, 81 S Ct 735 (1961), the Supreme Court succinctly stated, at page 540:

"Our decisions . . . have made clear that convictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system— a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth."

Measured by such a standard, it is impossible to reach any conclusion in this record other than that O'Such's statements were, as he testified, the product of coercive measures employed against him. True, "the question whether a particular criminal defendant's will has been overborne and broken is one . . . that must be decided on the peculiar, individual set of facts of his case," Culombe v Connecticut, 367 US 568, 622, 6 L ed 2d

**543**

1037, 81 S Ct 1860 (1961), but the facts presented here show the accused was questioned all night; subjected to criminological tests and processing all the following day; flung into solitary confinement without even the solace of light; harassed at night with flashlight checks every five minutes; not allowed even to lie down in the daytime; furnished with only a plank and pallet on which to lie at night; and, finally, brought forth on the evening of June 18th to be again subjected to hours of interrogation. That such bespeaks coercion is apparent. Indeed, though the Supreme Court has many times condemned lesser practices as coercive, see Rogers v Richmond and Culombe v Connecticut, both supra, we have not seen reported in recent times as bold an invasion of the rights of an accused person as is depicted upon this record.

While the conditions here pictured are sufficient in themselves to demand exclusion of accused's █ statements, we point out that other factors as gravely infect it with the character of involuntariness. Thus, it is admitted on the record that, when accused expressed fear of speaking because of the possibility of alleged accomplices harming his family, he was at first offered protection. When, however, he continued to maintain his silence, one of the officers interrogating him threatened to make it appear as if he had confessed and implicated others so that his wife and child would indeed be placed in jeopardy. That such a threat constitutes an additional coercive measure requires only that we point to United States v Askew, supra, wherein we held a confession motivated by threats to one's family could not be "the product of a free and unfettered choice between speaking and remaining silent." *Id.*, at page 263. See also Rogers v Richmond and Culombe v Connecticut, both supra.

Finally, it is also conceded on the record that accused, yet █ obdurate, was told his continued silence would lead to prosecution for a criminal offense, misprision of a felony. Though he was earlier made thoroughly aware of his rights under Code, supra, Article 31, such a later admonition had the effect of rendering the requisite warning nugatory. Cf. United States v Dalrymple, 14 USCMA 307, 34 CMR 87; United States v Williams, 2 USCMA 430, 9 CMR 60. Moreover, it was an outright threat to prosecute the accused if he continued to withhold information regarding the offense of which he was suspected, despite his undoubted right to remain silent. United States v Williams, supra. And, as has been well stated, "[n]o confession induced by official threat of prosecution is voluntary." Cannan v United States, 19 F2d 823, 824 (CA5th Cir) (1927).

The totality of evidence produced in this record, therefore, leads us inevitably to the conclusion that the statements admitted in evidence were obtained coercively and in violation of the accused's rights. Their use necessitates reversal of this conviction. We add only a reiteration of the hope expressed in United States v West, supra, that we will not again be confronted with treatment accorded an unsentenced and presumably innocent prisoner such as is depicted here. It goes without saying that security must be maintained over an individual suspected of a violent and despicable crime, and we have no disposition to interfere with such matters. Thus, we have carefully considered the views of our dissenting brother. But, when these measures are converted into engines of oppression and punishment in violation of constitutional and codal rights, we do not hesitate to enforce the will of Congress by setting aside convictions thereby obtained. Discipline requires justice and fair play no less than it does strictures and obedience.

The findings of guilty are set aside. The decision of the board of review is reversed and the record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.

Photograph of the scale model of the segregation cell.

KILDAY, Judge (concurring):

I fully concur with Judge Ferguson in his analysis and conclusions as to the law of this case. Thus, I agree with Judge Ferguson in his conclusions as to the involuntary character of the out-of-court statement of the accused.

I had supposed that our feelings with regard to such matters had been given clear and unequivocal expression in United States v West, 12 USCMA 670, 31 CMR 256. While no confession was secured from West, I believe our language in that case fairly leads to the conclusion that no statement secured after prolonged confinement to such a "box" could be regarded as voluntary and admissible. This result necessarily applies here. Appropriately so, in a case where the entire interrogation of the accused is taken on a recording tape—except for the purported confession itself.

QUINN, Chief Judge (dissenting).

Many undisputed facts and an important procedural matter are disregarded by the majority. The latter is tolerable, but the facts, in my opinion, require that the trial determinations be sustained.

At defense counsel's request, an out-of-court hearing was held by the law officer to determine the admissibility of the accused's pretrial statement that he killed Stack. When the issue was resolved against the accused by the law officer, the question of the voluntariness of the statement was submitted to the court members. However, the testimony before the law officer was not the same as that presented to the court members. For example, the accused testified in the out-of-court hearing, but he remained silent before the court-martial. It is well settled that appellate review of the validity of a trial determination normally focuses only on the evidence admitted before the ruling. United States v Dicario, 8 USCMA 353, 24 CMR 163; cf. United States v Kantner, 11 USCMA 201, 29 CMR 17. The majority opinion blends the evidence of the out-of-court hearing, upon which the law officer based his ruling, with that admitted in open court for the court members' consideration. I disagree with the admixture. But, in any event, proceeding on the majority's own terms, and viewing the issue within the enlarged evidentiary framework prescribed by them, I can accept neither their statement of the facts nor their conclusion that the accused's pretrial confession was involuntary as a matter of law.

To understand the nature of the accused's confinement, attention must be given to the circumstances that led to it. Sergeant Stack's dead body, with three bullet wounds in it, was found in some bushes off a road in Koza City, Okinawa, on Sunday morning, June 16, 1963. An investigation into his death was immediately started by the Criminal Investigations Detachment of the Army Provost Marshal's Office, under the supervision of Chief Warrant Officer Louis E. Brown, Chief of the Detachment Several investigators from the Army and others from the Marine Corps Criminal Investigations Detachment, became involved in the investigation. Among the latter were Sergeants A. J. Heysel and James E. Morrow.

By telephone, Heysel was asked by Chief Brown to identify a "number" found on the undershorts of the victim. He ascertained it belonged to Stack. About 10:15 that morning, Captain Arthur T. McDermott, the executive officer of Stack's company, was informed of Stack's death.[1] At Heysel's request, he agreed to go to the Kue Army Hospital to identify the corpse. As they prepared to leave, they were informed the accused and Stack, who were barracks mates, had been seen together the previous evening, and were overheard "talking about going out on liberty together." About 11:15 a.m., Captain McDermott identified Stack's body. Heysel went on to Brown's office. He arrived about noon and apprised Brown of Stack's identification, and related the information he had received about the accused and Stack. Brown directed two Army investigators, Specialists Hugh

[1] The commanding officer of the company was not present.

L. Turner and Edward J. VanPelt, to talk to the accused and "develop any other information they could." With Heysel, they went to the company area. There, they questioned the accused and several other persons.

According to Turner's testimony, corroborated by notes made by Heysel which were introduced in evidence by the defense, his interview with the accused began about 1:00 p.m., and lasted for approximately twenty to thirty-five minutes.[2] The accused was informed he was a possible suspect in Stack's murder, and was advised of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831. The accused "knew" his rights, because he had previously "worked in legal." Asked to recount his activities on the previous day, he, as phrased in his testimony, "covered the whole day." But, he gave two conflicting versions. First, he maintained he was with Stack at the snack bar, until about 9:15 p.m., but returned to the barracks alone, while Stack indicated he was going to the village. In the out-of-court hearing before the law officer, the accused testified he "almost immediately" changed this story to admit that he had himself gone to the Playboy Club in the village after he left Stack. However, Turner testified the change in the accused's story was not made until a "few minutes" after the accused gave the first account of his activities. Heysel's notes indicate there was a discussion as to Stack's character, activities, and friends before the accused changed his story to admit he had gone into town. The notes also indicate the accused continued to insist he had not seen Stack "at any time or place since the snack bar."

Turner and Heysel talked to other persons in the company. One of these reported he had seen the accused and Stack in the shower room at the barracks, at about 10:00 p.m., the previous night. Others reported Stack had publicly represented that a sergeant in the G–1 office owed him $300.00 and was obligated to repay double that amount. The accused worked in the G–1 office. He was a classified material control clerk and correspondence clerk. As such, he had free entry to the office at all hours and free access to the safe in which classified material was kept. The agents also learned Stack had told several persons he expected to receive a large sum of money on Saturday night from an Okinawan, and a sergeant in the G–1 office was "in the deal."

As a result of the assembled information, Heysel "was pretty much worried about O'SUCH's story." He was concerned about the change in the accused's account of his activities, and disturbed by "gaps" in both accounts, particularly those relating to time periods. He and Turner checked the accused's story. At the Playboy Club they determined the accused had not been there on Saturday night. They also verified that the accused that night was with Stack in the barracks shower room about 9:15 p.m., and was again with him about 10:40 or 10:45 p.m. Other information indicated that Stack met his death about 11:30 p.m. Inquiry at a bar frequented by Stack disclosed that on June 13, the accused had tried to get Stack to go to a party with him, but refused to tell him where the party was to be held, and refused to have anyone else accompany them.

All the information gathered by the several investigators was reported to Chief Brown, some time between 7:30 and 8:00 p.m. He concluded that arrest of the accused and a search of his person and effects were justified. Captain McDermott was notified. To be "sure that O'SUCH's rights were protected,"[3] he asked the agents who

---

[2] The accused testified his first interview with the investigators took place about 11:00 a.m., but he admitted it lasted no more than twenty to thirty minutes.

[3] This is the first of many circumstances which reflect efforts by the investigators to protect the accused's rights under the Constitution of the United States and the Uniform Code of Military Justice. The whole picture will become apparent as the text

were to effect the arrest to meet him in the company office.

Investigator Darryal B. Rutz went to the accused's quarters, where he found him in bed. He awakened him and told him to come to the company office.[4] At the office, Rutz informed the accused he was "apprehended," and they were to await the arrival of Captain McDermott. Before the captain arrived, he advised the accused of his rights under Article 31. He also told the accused he would "like to search his living area and . . . where he worked," but if the accused had any objection to the search, permission for it would be sought from the commanding officer. According to Rutz, the accused consented to the search.[5] No search was made until Captain McDermott arrived. The accused was again warned of his rights under Article 31; and again asked if he would allow a search of his quarters. McDermott explained to the accused that he had a "free choice" in the matter. The accused replied to the effect that he had " 'nothing to hide.' " McDermott believed the accused was "not just willing, but almost eager to have this search made." He further testified he would have prevented the search, if he "had felt . . . [the accused] didn't really want the search to be made." McDermott, Rutz, and the accused then went to the accused's quarters, where Rutz made a search of his wall locker and effects. A pair of shoes was taken.

After the search, the accused was escorted to the camp Military Police barracks and searched.[6] Two pieces of paper were found in his wallet. Only one is mentioned in the majority opinion, but the other is much more important to the issue. It was a small piece of paper on which two names were written. At the Army Criminal Investigations Detachment offices, to which the accused was transported after the search of his person, the paper was shown to Chief Warrant Officer Billy M. Harris of the Marine Corps 3d Counter-Intelligence Team. He immediately recognized one name as that of a "known member" of a subversive organization; the other name was found on a "subversive list" maintained by counterintelligence. As will be seen, this information gave substantial color to various stories of espionage related by the accused during the interrogation in issue, and serves to explain some of the circumstances of his confinement.

For a time, apparently while the names on the paper were checked, the accused was left in a room by himself, with a guard stationed at the door. About 11:15 p.m., Turner and Heysel started to interrogate him. He was again given a "thorough warning" as to his rights under Article 31. He was informed his story of going to the Playboy Club did not check out, and he was asked to review once more his activities on the night of June 15. Although the accused talked about a number of things, he made no incriminating statements. Asked a number of questions about the names on the paper found in his wallet, he "didn't," as he testified, "say anything." The questioning ended about 3:00 a.m. In the interim

is developed; it is a picture which refutes the majority's contention that all they did was part of a plan of "coercive measures" to force a confession from the accused.

[4] The accused testified he secured at the G–1 office between 5:00 and 5:30 p.m., and went to his barracks to sleep. He said he "had just dozed off," when he was awakened by Rutz. His time does not coincide with the time Brown concluded he should be apprehended.

[5] At trial, the accused contended his apprehension, and the search that followed, were illegal. Both contentions were decided against him by the law officer. The rulings were challenged in the accused's petition for grant of review, but we perceived no "good cause" to grant review on these issues. See Article 67(b)(3), Uniform Code of Military Justice, 10 USC § 867.

[6] It is interesting to note that Investigator Rutz took no special precautions to control the accused. Later, he was reprimanded by the Provost Marshal for not handcuffing the accused while en route to the office.

there had been, as the accused admitted, "numerous breaks." According to the accused, he was then handcuffed and taken to a room to wait for a paraffin test to determine if he had recently fired a gun. He left the office for the crime laboratory about 6:00 or 7:00 a.m. Nowhere in his testimony did he indicate whether he had been able to doze or sleep during the wait. I am willing to assume, as the majority do, that he did neither.

About 9:30 a.m., on June 17, the accused had breakfast. Thereafter, he packed his gear for confinement; then just "stood around" waiting. He refused lunch. About 1:00 p.m., he had a physical examination, and returned to his barracks. There, he merely "fooled around," waiting for further instructions. About 4:00 p.m., he was taken to the Joint Services Stockade but, for a reason not disclosed in the record, was rejected as a prisoner. He was thereupon transported to the Camp Butler brig and confined in Cell 12. It was then about 5:00 p.m., June 17.

That brings me to the conditions of the accused's confinement for the one day before he made his statement. Perhaps the best way to express my disagreement with the majority's view of the evidence is to consider the major circumstances individually.

### 1. *The cell as an instrument of coercion.*

#### (a) *Physical dimensions.*

Emotion-laden words are not substitutes for facts. The majority say the accused was "flung" into a cell which they characterize as a " 'black box.' "[7] The accused testified he was "taken" to a room at the brig where his personal effects were "taken from" him. Then, he was "marched" to the cell, and "put in" it. He was told to "behave himself."

The cell was a room in a quonset hut. According to measurements made in November 1963 by a defense witness, it was seven feet, five inches

[7] The description is apparently based upon the accused's testimony that the cell was "a box more or less,"

long by four feet, ten inches wide. The height varied from eight feet in front to seven feet, six inches in the rear. The majority imply these proportions were horrendously small and mean. The opposite is true, considering the nature and the type of accommodations used by military personnel in the area.

The accused is five feet, ten inches tall. At the time of his incarceration he weighed one hundred ninety-five pounds. These figures make it most unlikely that he measured more than twenty-four inches across the shoulders. It is, therefore, obvious that the physical dimensions of the cell were not disproportionate to the accused's stature.

Other comparisons appear in the record. The accused's sleeping quarters were also in a quonset hut. The accused testified he occupied a "cubicle," formed by a wall locker which separated him from the adjoining hut mate. His bed was only four to five feet from that of the adjacent cubicle. In addition, one of the guards, who testified as a defense witness, stated that the cell was better constructed then the officers quarters "over at Tengan." Manifestly, the size and general appearance of the cell were not materially different from those of the regular living quarters for Marine Corps personnel on the island.

#### (b) *The cell as a " 'black box.' "*

The majority describe the cell as a " 'black box' "; and they conceive the absence of "the solace of light" as one of the major coercive measures used against the accused. The description is unsupported by the evidence in the case.

A special detail of sergeants was formed to stand guard watches at the accused's cell. Two of the members of the detail testified as defense witnesses. These were Sergeants Wayne D. Lee and William E. Ison. Sergeant Lee testified to circumstances occurring during his two tours of duty, which ran from 11:40 p.m. to 3:47 a.m., June 17, and from 3:30 to 6:30 p.m., June 18. Sergeant Ison testified

to his observations and actions during a tour of guard duty from 3:47 to 7:30 a.m., June 18. Lee stated he did not notice any electric light in the cell, and he observed no light coming through the openings in the cell wall and cell door. Since his first guard tour occurred during the nighttime, and the second during a typhoon in the late afternoon, it may be doubted that his testimony is entitled to much weight. However, the accused, answering a question by his counsel as to whether there was "any light in the cell," stated there was "[n]one at all." Apparently, the majority accept this testimony as definitive.[8] There is, however, a great deal more evidence in the record as to the amount of light in the accused's cell.

The record shows that, while in the cell, the accused wrote a six-page letter to his wife. The letter was written about two o'clock in the afternoon. The paper was ruled; the lines of writing were precisely aligned with the ruled lines on each page. It also appears that the accused prepared a health and comfort chit while in the cell. The evidence further indicates the accused brought reading matter from the brig library into the cell. But perhaps most revealing of the fact that the cell was open to a source of substantial light is the accused's own testimony. He testified he "was watching the guards and the prisoners out in the yard" and saw they treated "prisoners wrong for almost anything they did." Evidence in the record indicates Okinawa has a semitropical climate, and that the daylight hours of the period in issue extended from at least 6:00 a.m. to 8:00 p.m. The various activities performed by the accused while in the cell make it apparent that enough light came through the openings in the cell wall and cell door during normal daylight hours to provide him with ample illumination. In my opinion, all these circumstances provide a solid basis from which to conclude that the cell was not a box of frightening and frightful darkness.[9]

### (c) *The accused's sleeping accommodations*

The majority imply that the accused's sleeping accessories were calculated to coerce him into making an incriminating statement. They describe these as "plank" and "pallet." What does the record show?

The plank was a sheet of varnished plywood, measuring seventy-six inches by thirty inches. It was permanently affixed to a frame of what appear to be two-by-fours, so that it was raised approximately three and one-half inches off the ground. Common experience suggests that, except for the height above the floor, these dimensions are not much different from those of an ordinary bed. As to the pallet it was described by Sergeant Ison as "a mattress of the type generally used on the enlisted men's rack, with mattress cover." Sergeant Lee testified the mattress wasn't one of those "big Navy mattresses," but he admitted the Navy had bigger mattresses than the Marine Corps.

Neither the plank nor the pallet are significantly different from what the accused had in his own quarters. He testified the beds in his quonset hut were "the normal Marine Corps metal racks with a mattress." Each rack was closed in by a metal T-bar at each end to support a mosquito net. The law officer was a senior Naval officer and the court members were senior officers and enlisted men of the Marine Corps. I am certain all of them knew what the "normal" Marine Corps bed and Marine Corps mattress looked like. See United States v Jones, 2 USCMA 80, 87, 6

---

[8] Sergeant Ison's testimony on the point is as follows:
"Q: Now, was there any artificial lighting in the cell?
"A: There was no other lighting."
[9] The photograph of the scale model appended to the majority opinion is not a true representation of Cell 12 when the accused was first put in it. The cover over the lower opening in the doorway was not on it. Sergeant Lee testified this cover was added in order to keep out the rain during the "peak" of a typhoon in the late afternoon of June 18.

CMR 80. As for the plank, in my opinion, the law officer and the court members could compare the sleeping comfort of a mattress supported by a plywood base with one supported by the regular metal rack, and conclude, as I have, that it was not calculated to prevent sleep. And perhaps more importantly, they could conclude that a plywood bed was a better safeguard against possible suicide than a regular metal bed.[10]

### 2. *The nature of accused's treatment on the night of June 17*

The majority describe the accused's treatment the night before his confession as "brutality completely at odds with any civilized notion of treatment of a suspect." They contend the "discipline" imposed upon the accused constituted a "coercive measure" which served "to deprive him of rest and sleep until his interrogators" could question him. In effect, they conclude that the conditions of his confinement were intended, and used, to "soften up" the accused. The conclusion is based on new findings of fact which, in my opinion, are contrary to the weight of the evidence.

#### (a) *The visual inspections of the accused*

As noted earlier, the accused's cell was constituted a special post, and a group of sergeants was detailed as guards. The instructions they received leave no doubt that the confinement authorities believed the accused might take his own life. There was good reason for their apprehension. The accused had been arrested for murder, and he was linked to members of a known subversive organization. According to Sergeants Lee and Ison, the guard orders directed that the accused be observed in the cell at regular intervals in order to check on his "well being."[11] As Sergeant Ison testified, the guards

were "to ensure that there were no suicidal attempts."

In the majority's view, the manner in which visual checks on the accused were made is compelling evidence of coercion. Yet, the testimony of both defense witnesses demonstrates they carried out their orders with solicitude for the accused's welfare. Ison testified he never touched the screen on the cell door when he shined his flashlight into the cell. He said he specifically tried not to focus the light on the accused's face. Lee testified he looked in on the accused during his checks "normally," and did not try to make any noise just to "keep him awake." The guard log reflects nothing to indicate the guards did things merely to harass or annoy the accused. No complaint about any such treatment was voiced by the accused in his own testimony.

#### (b) *The accused's clothing*

The majority discern a special evil in the fact the accused was allowed no clothing but his underwear. Was this circumstance demeaning and coercive? I think not. I have already pointed out that the brig authorities apparently feared the accused might commit suicide. This fear made it entirely reasonable to deprive the accused, during the night, of all articles of clothing that could be used for that purpose. In fact, Sergeant Lee testified he thought the accused wore only underwear because "they took everything away from him that he could use in hurting himself." The accused's testimony supports the inference that he did not find it uncomfortable, indecent, or coercive to have his nighttime dress limited to his underwear. He testified that while he had been given a skivvy shirt, he "didn't have it on." The weather was hot and humid. Although the temperature and humidity for the night of June 17 are not directly indicated,

---

[10] As I shall point out later in the text, one of the reasons for the special guard was the fear that the accused might commit suicide.

[11] The written instructions to the special guards, dated June 18, which

were admitted as a defense exhibit, are to the same effect. In part they direct the guards as follows: "You must also insure that he [the accused] is not mistreated and that he not be permitted to harm himself."

there is evidence that on June 15, the temperature did not go below seventy-nine degrees at night, and the humidity was not less than eighty-eight percent. A defense witness conceded that during the summer season the ground was "warm" in the nighttime. The guard log shows the doctor visited the accused in the cell on the morning of June 18, but there is no record of any complaint by the accused that because of his limited dress he spent a cold, uncomfortable, or dispirited night in the cell.

### (c) *Denial of the right to lie down*

Much is made by the majority of the alleged fact that the accused was not permitted to lie down from reveille to recall. The accused did indeed testify that shortly after he had dinner on the evening of June 17, he wanted to lie down, but was told he had to either to stand up or sit up until the "lights went out." He also testified that a "couple of times" during the day on June 18, he "tried to lie down," but "was told to get up." However, the testimony is not unchallenged. Sergeant Lee, who stood a watch between 3:30 and 6:30 p.m., on June 18, testified he saw the accused "laying down." Asked whether the accused was allowed to sleep during the day, he answered: "The instructions never said he couldn't or could."

In any event, disregarding the conflict in the testimony, and assuming, with the majority, that the accused was not allowed to lie down, that circumstance might justify criticism of the brig officials for not fully appreciating that as a suspect, rather than a convicted prisoner, the accused should have been treated with more consideration. Censure of the brig officials for insensitivity to the accused's position is one thing; concluding that denial of the right to lie down, during the daylight hours, was part of a scheme of oppression to break down his ability to withstand interrogation is another matter. United States v Broy, 14 USCMA 419, 425, 34 CMR 199. In its worst possible light, the effect of the restriction of the accused's freedom of movement

in the cell on his physical and mental stamina during the interrogation in the evening of June 18 was a question of fact for the law officer and the court members. In my opinion, there is ample evidence to support their conclusion that the restriction was not a "coercive measure" to force a confession.

### (d) *The accused's lack of sleep*

The majority maintain that the accused was deliberately deprived of sleep. I have already noted that both guards who testified for the defense stated that, when they made their visual inspections of the cell, they attempted to avoid discomforting the accused. Whether the accused actually slept during the night is a different question. He said he did not. His testimony is as follows:

". . . [E]verytime I tried to drop off the screens would bang— these metal screens—and everytime they would bang, lights would come into the cell and they would hit various parts of me, and sometimes later in the evening it got where they would actually hit me in the face. At that point I rolled over and tried to keep my eyes closed and tried to go to sleep, I couldn't."

Purportedly, this state of affairs continued throughout the night. However, the guards told a different story. Sergeant Lee, who was on duty between midnight and four o'clock, testified he observed the accused with his eyes closed, and noted that his breathing was regular. While he would not say the accused was actually asleep, he admitted, under trial counsel's questioning, that "it appeared that he was sleeping." Sergeant Ison went on watch at 3:47 a.m. He testified specifically that the accused "was sleeping when I came on post."

The majority resolve the conflict in the testimony in the accused's favor, and conclude he was deprived of sleep throughout the night. They refer to Staff Sergeant James E. Morrow's testimony to the effect the accused "had been up for about two days and two

nights." Morrow's statement is patent hearsay. Apart from its incompetence as hearsay (United States v Carrier, 7 USCMA 633, 23 CMR 97), the record demonstrates Morrow did not really know whether the accused slept during the night of June 17. The guard log shows he did not visit the cell during the night; and his testimony indicates he was busy elsewhere checking out other leads. As I read the testimony in context, Morrow did not intend the remark as a representation that the accused did not, in fact, sleep for two days, but merely to indicate he had postponed questioning the accused to give him a chance to rest. See Appendix A. Be that as it may, in my opinion, the evidence amply supports findings by the law officer and the court-martial, to the following effect: (1) That the accused was not deliberately deprived of sleep to exhaust him physically and mentally in preparation for later interrogation; (2) that the accused did sleep for some time during the night of June 17; and (3) that if, in fact, the accused had little sleep during the night of June 17, it had no significant effect upon the voluntariness of his confession on the evening of June 18.

(e) *Other indignities allegedly suffered by the accused*

The majority refer to other "indignities inherent" in the accused's confinement. At trial, the accused complained that he had to address the guards as " 'Sir.' " Perhaps a person confined as a suspect ought not to be required to address enlisted guards in terms ordinarily reserved for commissioned personnel, but a term of respect can hardly be considered an indignity. The only "indignities" of confinement about which he really complained were that he was put into the Camp Butler Brig, instead of the Joint Services Stockade, and was treated like a sentenced prisoner. His testimony is as follows:

"Q: Is it your testimony that your confinement facilities were overbearing for a person suspected of possible espionage violations?

"A; No, sir, I'll ask you . . .

no, I'll answer that same question; I'll say yes. Why couldn't I be sent to Joint Services Stockade and have at least a decent roof over my head; a little bit of comfort; and meals gotten on time; a rack to sleep on; at least a toilet and water running when I wanted it? They had adequate facilities down there, so why must I be put in a torture chamber at Butler with this nice tar roof?

"Q: The question is that you were a suspect of murder.

"A: Of course, but this could all have . . . also have been done down at Joint Services Stockade. Even maximum security prisoners they get at Butler get sent down there. I'm the only person I have ever seen that's been confined at Camp Butler for any length of time on a capital offense or anything . . . any offense due to to [sic] any great number of . . . any felonious offense.

"Q: You didn't like the meals there I understand, Sergeant O'SUCH?

"A: I didn't like the meals. The meals usually got over cold. There was no type of furniture there; no reading material. This brig incidently has . . . in that area where I was the first day I was there I was told that I was the same as the rest of the prisoners who were there for punishment as stated before, and was not allowed to smoke."

Even these complaints were not justified. I have already noted that the accused was first taken to the Joint Services Stockade. However, the authorities there refused to accept him as a prisoner. As to the special conditions of his confinement for the night, the law officer could conclude they were reasonable, in light of the apprehension that the accused might attempt suicide.

To this point, I believe I have demonstrated that the evidence in the record of trial does not support the majority's thesis that the discipline of the accused's confinement constituted "brutality," deliberately de-

signed to exhaust him physically and mentally. I now turn to consider specifically the effects of the confinement upon the accused at the moment he made his incriminating statement.

The majority maintain the statement was the product of coercion. The conclusion rests on two major premises: (1) That the accused was exhausted from his ordeal during the previous night; and (2) that he was threatened. There is a mass of evidence to justify opposite findings of fact and an opposite conclusion. The best way to present the conflicting material is to consider each factor separately.

### 1. The coercive effect of the accused's confinement and interrogation

Although the accused testified at length about the deficiencies of the cell, specifically, that it lacked a regular metal cot, that it had no electric light, that there were no washing facilities,[12] and as to his inability to sleep, he said nothing which can fairly be construed to indicate he believed he confessed because he was fearful of, or coerced by, the conditions of his confinement. His only claim with regard to the confession itself was that he was "exhausted" when he made it. Thus, when asked by his counsel to describe his mental and physical condition "about the time that Warrant Officer HARRIS came in" the interrogation room, which was about an hour and a half before he actually made the confession, his answer was as follows:

"About the time, sir, from lack of sleep and physical exhaustion, myself from the manner of having a matter like this resting on me and having to go through this interrogation. I folded or something . . . I don't know."

Trial counsel also questioned the accused on the subject. He again maintained only that he was "exhausted."[13] In my opinion, the substance of the accused's testimony is not an attack on the voluntariness of the incriminating statements, but rather a denial that the statements were made. See Appendix B. However, the majority concede the record "affirmatively demonstrates that he admitted killing" Stack. My reading of the record convinces me there is also an abundance of evidence to sustain the determination by the law officer and the court members that the confession was voluntarily made.

What I have already said about the conditions of the accused's confinement need not be repeated. In addition, Sergeant Ison testified that when the accused "was awakened" on the morning of June 18 he appeared to be drowsy, but "in charge of his mental faculties." Warrant Officer Harris testified that during the interrogation itself, the accused "did not appear to be tired, or overtired. He did not appear to be sleepy or exhausted. He had looked in good physical condition." The accused admitted that, after he and Sergeants Morrow and Heysel went into the interrogation room, they "kibitzed back and forth" for a time. Such conduct is inconsistent with the accused's contention he was "kind of exhausted" when the interrogation began.

One item of evidence, overlooked by

---

[12] The washroom was only ten feet away.

[13] The questions and answers are as follows:

"Q: . . . . The fact that you had to say 'Sir' to men lower in rank than you; the fact that your cell had only this pallet there; the fact that you had some discomfort because you couldn't make head calls at such time as you wanted; would these discomforts combined cause you to confess to a murder which you had not committed?

"A: . . . .

"DC: I object to that question. . . .

"LO: Objection overruled.

"Q: Did this cause you to confess to a murder you did not commit, Sergeant O'SUCH?

"A: I don't know, sir. At that time I was too exhausted, sitting there thinking about it. I was exhausted in there so much time, and I don't know whether I did or not."

the majority, is particularly significant to me. Sergeant Morrow testified that on June 20, in response to the accused's request, he went to the brig to talk to him. Before engaging in any conversation, he advised the accused of his rights under Article 31. The full conversation is not set out in the record, but apparently the accused pleaded with Morrow for help.[14] In the course of the conversation, Morrow asked the accused if he would go to the scene of the homicide and reenact the crime. The accused said "he would provided that it was all right with his counsel." Morrow called the lawyer and told him what the accused had said. The lawyer told Morrow "it was all right with him" as long as the accused understood he could not be compelled to reenact the crime. By inference, it appears the lawyer's statement was relayed to the accused, and he agreed to the reenactment. He and Morrow left the brig for Morrow's office. However, when they arrived there, the accused "changed his mind about a reenactment," and was returned to the brig. Morrow, whose candidness is acknowledged by the majority, was not impeached or contradicted. In my opinion, this testimony can, at the very least, be construed as an admission by the accused that at the interrogation he had voluntarily confessed to killing Stack. Alone, it casts great doubt upon the truthfulness of the accused's trial testimony; considered with all the other evidence on the issue, it establishes a solid basis for a determination that the accused's confession was the product of a free and unfettered choice to speak or remain silent.

### 2. The alleged threats

A typed transcript of a recording of the interrogation is in the record of trial. The transcript is very poor because the recording was very poor, but still a reading of it compels the conclusion that the remarks which the majority describe as threats were ac-

tually offers to help the accused. In any event, even if construed as threats, they obviously had nothing to do with the specific circumstances under which the accused made his confession.

It is, I think, most significant that, while individual defense counsel set out ten separate grounds of objection to the admissibility of the accused's confession, he said nothing about threats. Nor does the accused's testimony contain a word about threats. The whole of his testimony on direct and redirect examination, as to the substance of the questioning, is as follows:

"Q: Do you recall the questions and answers as they progressed through this interrogation?

"A: I know that I was resisting to answer. At this time, in fact, Warrant Officer HARRIS had the peculiarity of having me repeat my name because I wouldn't answer questions. I was more or less slumped down in the chair more or less, but the line of questioning as it went along kept hitting on CI aspects and as to exactly what I did say I just don't believe that I said what was on that tape and after hearing it even now I can't believe it."

At the beginning of the questioning, the accused was again informed he was suspected of murder, and advised of his rights under Article 31. He indicated he "thoroughly understood" the Article. Asked to review his activities on the night of June 15, he gave essentially the same account he had given to Sergeant Heysel on June 16. This time, however, he admitted he had access to a safe in the G–1 office, which contained a .32 and a .45 caliber pistol. Heysel told the accused that "[t]his thing has come to a head"; they knew he had not been in the Playboy Club, and that he had taken a gun from the safe. With that, the accused changed his story.

He said he went into town to meet a man named Higa. He explained that on the evening of June 13, he received a telephone call from an

---

[14] Sergeant Morrow testified the accused "stated that he was asking for his life."

Okinawan, who told him he wanted a gun, and instructed him to deliver it to Higa. Apparently, the accused's manner, if not his words, suggested he had other information about Stack's death, but was afraid to disclose it. At any rate, Morrow and Heysel made several statements about protecting the accused's family, if he disclosed the names of persons involved in Stack's death. These comments are interspersed with various questions and answers about the accused's activities, and include a denial by the accused that he was the "triggerman." The statements are set out in Appendix C. Here, it is sufficient to say that, fairly construed, they constitute a promise to protect the accused and his family against harm, if the accused disclosed the names of the persons whom he implied killed Stack, provided, as Warrant Officer Harris put it, in his testimony at trial, his story was not "a hoax . . . or something of this nature."

There is indeed, as the majority observe, a comment as to what might happen if the accused chose to remain silent, but the remark is certainly not a threat to expose the accused's family to danger unless he confessed to Stack's murder. The accused's answers to the various statements, and his continued refusal at that stage of the interrogation to reveal any names, clearly indicate he did not construe the protection statements as threats. Up to that point in the questioning, he had merely indicated he knew who committed the murder, but was afraid to reveal names for fear of reprisal. The promises to protect the accused and his family against the purported killers was not, in my opinion, an improper inducement to obtain a confession from him that he was the real murderer. As a matter of fact, the record tends to indicate that the accused's story about espionage was completely false.[15] He, therefore, could not possibly have considered the agents' remarks as threats.

The pertinent part of the questioning that led to the statement about misprision of a felony appears in Appendix C, pages 562 and 563. In my opinion, the remark cannot fairly be construed as a threat to prosecute for misprision of a felony, if the accused did not confess to Stack's murder. It was merely a comment on the accused's status, as it appeared from his story implying he knew who killed Stack. In any case, the law officer could reasonably conclude there was no connection between this remark and the circumstances surrounding the accused's confession. See United States v Wimberley, 16 USCMA 3, 9, 36 CMR 159. Again, I think it important to bear in mind that, in his own testimony, the accused said nothing about the effect the misprision remark had on him.

After the misprision of a felony statement was made, there were a few additional remarks about safeguarding the accused and his family. A recess was then taken. When the interrogation resumed, Warrant Officer Harris took up the questioning. The reason for his appearance at this time is apparent. The accused's answers clearly implied that subversive interests were responsible for Stack's murder. It will be recalled that the previous night Harris had been informed of the paper containing the names of two known subversives, which had been found in the accused's wallet. At that time, he thought there might be "possibly attempted espionage."

Under questioning by Harris, the accused said he gave the gun he took from the G–1 office safe to Higa at the Playboy Club. At Higa's direction, he accompanied him to a place about a half-mile from the club. There they met Stack. Higa told Stack and the accused to come along with him. They proceeded down a dirt road, with the accused walking in front of the others. Suddenly, the accused heard "two shots go off."

---

[15] Warrant Officer Harris testified that continued investigation of the matter by the Marine Corps and the Army Criminal Investigations Detach- ment led to the conclusion that the accused's story about reproducing and selling classified matter was false.

Stack screamed and fell to the ground. Higa stepped over and shot Stack again in the chest. He instructed the accused to take Stack's wallet, which the accused did. At Higa's direction, the accused dragged Stack's body off the road and pushed it over an embankment. The accused gave Stack's wallet to Higa, and Higa returned the gun to him which, on his return to camp, he replaced in the office safe.[16] Asked why Higa killed Stack, the accused replied "Stack wanted more money." He denied Stack had tried to blackmail him. Heysel expressed disbelief of the story, and told the accused he thought it was "fabricated." He and Morrow began to question the accused as to whether Stack had been "shaking . . . [him] down." There was some talk about a lie detector test, but the accused refused to agree to take one.

After a break, the accused again reviewed his associations with Stack. Except for admitting he "wasn't the only one" involved in Stack's death, his answers were generally noncommittal. However, he finally remarked that Stack "wanted . . . [him] to get $5,000.00," because he "knew what . . . [the accused] was doing." Questioned as to what he was doing, he replied that Stack "caught . . . [him] taping" classified information in the office. He represented he had obtained $600.00 from unidentified Okinawans for tapes of the content of classified matter, including the deployment of Naval shipping, and he gave $325.00 of that amount to Stack. Sometime later, Stack said he needed more money and he gave him some. In June, Stack told him he was leaving Okinawa, and he wanted $5,000.00. As a result, the accused contacted one of the Okinawans to inform him Stack knew he was taping classified matter and that Stack wanted $5,000.00. The Okinawan told the accused he could not help him. At that point, the questioning was interrupted by the counterintelligence team commander. Har-

ris told Sergeant Morrow to take a break, and let the accused "relax," while he conferred with the team commander.

The accused and Sergeant Heysel went outside the building to smoke. It was there that the accused made the incriminating statements. As related by Sergeant Morrow, the circumstances were as follows:

"Q: Did anything unusual occur during a particular break?
"A: Yes, sir.

"Q: Would you relate what that was . . . the circumstances surrounding this.
"A: Sergeant HEYSEL, who was with me, had taken Sergeant O'SUCH out in back of the building just outside the door. They were standing there smoking and getting a breath of fresh air, and I walked out and I walked up to Sergeant O'SUCH and I made the statement, 'you've been lying to me, haven't you? You, in fact, shot STACK,' and he said, 'Yes, I'm responsible.' I said what do you mean 'I'm responsible', and he said, 'My God, I killed him. What am I going to do?'

"Q: What else? What, if anything, did he do then?
"A: Well, then he began to cry.

"Q: Did he state the manner in which this had been done?
"A: Yes, sir.

"Q: What did he state?
"A: He stated that he shot him twice in the back and once in the chest."

Later, at Morrow's office, the accused remarked that he "didn't know why he hit STACK in the dark because he didn't qualify [with the pistol] on the range." As I pointed out earlier, in his own testimony the accused did not contend he was in any way threatened by any person present at the interrogation. Nothing in his testimony even remotely suggests he

[16] During the interrogation, Morrow was informed that Stack's identification and liberty cards had been found in a hole in the ceiling of the G–1 office. Later, the accused admitted he had taken them from Stack's wallet, and hid them in the office.

answered Morrow's questions because he was afraid that if he did not speak he would be prosecuted for misprision of a felony, or would be left to face the danger of reprisal by those he alleged were involved in Stack's death. During the actual interrogation, he had been asked many times whether he killed Stack. On each occasion he either gave an innocent answer or avoided a response. Since he was patently uninfluenced by the alleged threats at that time, it is virtually impossible to imagine that during the break he was compelled by them to confess.

In summary, this case is not at all like United States v West, 12 USCMA 670, 31 CMR 256. It just cannot be said the accused's confession was the product of coercion and threats. In the light most favorable to him, the voluntariness of his confession depended upon the credibility of the witnesses and the inferences drawn from the various circumstances of his confinement and interrogation. In my opinion, the evidence abundantly supports a finding that he was not deprived of the free choice to admit, to deny, or to refuse to answer the two questions Morrow asked him during the break. I would, therefore, sustain the trial ruling of the law officer and the decision of the board of review. United States v Askew, 14 USCMA 257, 34 CMR 37.

## APPENDIX A

[Testimony of Sergeant Morrow]

"Q: Did you have occasion to see Sergeant O'SUCH on 18 June 1963?
"A: Yes, sir.

"Q: Approximately what time did you first see him?
"A: I first saw him about 1830–1845.

"Q: And where was this?
"A: At the CID office at Camp Hauge.

"Q: Did you have a occasion to see him later?
"A: Yes, sir, I did.

"Q: And where was this, and at what time?

"A: This was at the counter intelligence office at about 1915.

"Q. And what occurred at this time?
"A: I took Sergeant O'SUCH into the interrogation room to proceed to question him.

"Q: And what did you do at this time?
"A: I made him aware of his rights under Article 31, Uniform Code of Military Justice.

"Q: How?
"A: I read it to him from the Manual. I explained it to him and he read it back to me and stated he understood.

"Q: Now, Sergeant MORROW, why was Sergeant O'SUCH being questioned at this time, if you know?
"A: He was informed that he was suspected of murder.

"Q: Now, why was Sergeant O'SUCH being questioned at this time, 19... or whenever it was?
"A: Well,· he was being questioned as a murder suspect, because of certain circumstances which we had uncovered that developed him as a suspect.

Q: Why wasn't Sergeant O'SUCH questioned earlier during that day, do you know?
"A: Well, he had been up for about two days and two nights and also we had several things that we had to check out before we could question him."

## APPENDIX B

[Accused's testimony as to his pretrial statement]

"Q: Did this cause you to confess to a murder you did not commit, Sergeant O'SUCH?
"A: I don't know, sir. At that time I was too exhausted, sitting there thinking about it. I was exhausted in there so much time, and I don't know whether I did or not.

"Q: That you did or not what?
"A: Whether as you say, confess to this murder.

"Q: You don't recall whether you confessed to it or not?

"A: No, sir, I do not. Knowing myself as I do, I doubt if I would confess to a murder that I did not commit.

"Q: Speak up, Sergeant O'SUCH, please.

"A: Knowing myself as I do, I doubt very highly if I would confess to a murder which I did not commit.

"Q: Well, would you confess to a murder that you did commit?

"A: . . .

"DC: I object to that question.

"LO: That objection will be sustained.

"Q: Sergeant O'SUCH, you do not recall if you committed the murder or not?

"A: . . .

"DC: Now . . .

"Q: I'm sorry. You do not recall if you confessed to committing the murder or not, is that correct?

"A: Yes, sir. To the best of my ability, I doubt very much if I would have confessed to this.

"Q: Wouldn't this be a thing you would ordinarily remember, Sergeant O'SUCH?

"A: Yes, sir, it would.

. . . . .

"Q: Then you recall going back to the brig after talking to Lieutenant CASTLE; you went back to the brig?

"A: Yes, sir. It was sometime in the morning, early morning.

"Q: You recall that?

"A: Yes, sir.

"Q: Sergeant O'SUCH, how come you recall that but you don't recall something that happened earlier? It seems that you would be more tired in the morning when you say you recall what happened then.

"A: Captain, all I said that I recall that I was talking to Lieutenant CASTLE. Right now I can't tell you what I said to Lieutenant CASTLE.

"Q: But you do recall talking to him?

"A: I remember seeing him over there, yes.

"Q: This was after the alleged statement which you state you don't remember anything about, isn't that right?

"A: Yes, sir.

"Q: But you don't remember the statement?

"A: No, sir, I do not.

"Q: You don't deny you made the statement?

"A: . . .

"DC: I object to that as being beyond the scope of the direct examination and not being related to the issue before the court.

"TC: Mr. Law Officer, it passes understanding how counsel could make a statement like that. It's the whole issue.

"LO: Objection overruled.

"Q: You don't deny making the statement. do you, Sergeant O'SUCH?

"A: As I've stated before, sir, I don't know whether I made it or not."

## APPENDIX C

[Tape Recording of Accused's Interrogation]

KEY: ooooo—Response not audible on the tape

nr—No response

"Tape #2

"Q: Where did you meet this man?

"A: oooo Moromi.

"Q: Where?

"A: You know where the Playboy is?

. . . . .

"Q: What was the occasion of this meeting between you and this man? Did you plan to meet him there or was it accidental?

"A: oooooooooooo

. . . . .

"Q: You planned to meet him?

"A: I was told to meet him.

"Q: You were told to meet him. Who told you to meet him?

"A: ooooooooooooooooooo phone call ooooooo

"Q: Did he tell you to get the gun?

"A: I'm up to my neck . . . I'm up to my god damn neck in this thing and I didn't kill him, damn-it.

"Q: We'll we . . . we'll find this out if you didn't. Now, you received a phone call. What day was this?

"A: Last Thursday.

. . . . .

"Q: What did this man say to you? Come on, tell me all about it. Get it off your chest, you'll feel better about it. We're going to protect you. There's nothing going to happen to you. There's nothing going to happen to your family. The law is a big thing and the arm of it is very long. Two hours they can be in protective custody. These punks are not going to hurt your family. They're not going to hurt you. Now what did he say? What was the conversation when he called you? And why did he call you? Here's the thing, son, now let me lay it on the line for you. You've already told us this much, you may as well tell us the entire story. We probably know it better than you do. Doesn't that make sense? If we didn't know we probably wouldn't have you sitting in that chair, would we? If we didn't know I couldn't have told you about this gun, could I?

"A: No.

. . . . .

"Q: About the gun. About your being on the scene. So now tell me all about it. We know it; tell us. You don't think that we will protect you? We've got 23,000 men on this island that will protect you. Your family will be protected. How did you meet this man? Hmmmm?

"A: oooooooooooooooooooooooooo

"Q: You'd go to court for him?

"A: ooooooooooooooooo

"Q: You mean to sit there and tell me that you would take a murder rap for someone else? Because you're afraid that this guy will get to your family? Is that what you're telling me? He probably will get to your family if you don't tell us about it. Now, what did he say when he called you Thursday on the telephone? Did he tell you to meet him at the Playboy? Hmmm? Look at me O'SUCH?

"Heysel: The only way we can help is with your cooperation.

"Q: That is the only way. You'll have to cooperate with us. If you want help, if you want to protect your family, you'll have to cooperate with us. We can't do it unless you tell us what happened. Did he tell you to bring Stack in with you? Huh? Come on, tell us about it, you'll feel better. You can't live with this, son. This man was your friend wasn't he? Huh? Here he is, shot three times in the back and dumped in a ditch, and of all things in a benjo ditch. (LONG PAUSE) You even took his wallet and his ID card and stuck it in a crack over in G–1, didn't you? Huh? Why, O'Such? Here's a man who's your friend, dumped on a filthy Okinawan road in a garbage pile. In a rubbish heap. Left to die. Shot unmercifully three times in the back. Why? Why did this friend of yours have to die? Hmmm? How can you expect us to protect you from this person or your family from this person if you don't tell us all about it? Answer me that; can you? Hmmm? We have been honest with you; we're asking you to be honest with us. Is that too difficult when you know we know the answers? Now you tell me when you arrived at the club he was standing inside the door. Is that right?

"A: ooooooooooooooooo

. . . . .

"Q: Okay, let me make you aware of Article 134, paragraph a and b. Do you know what that says, huh? I'm going to show you.

"A: nr

"Heysel: Tom, if you're worried

about your wife and family, why are you going to take a murder rap when you don't have to? Huh?

"Q: This is 'misprision of a felony'. I want you to listen to this very close: 'A person who has knowledge of the actual commission of a felony by another and who conceals and does not as soon as possible make known the same to the civil or military authorities is guilty of misprision of the felony. Any offense of a civil nature punishable under the authority of the code by death or by confinement for a term exceeding one year is a felony. A mere failure or refusal to disclose the felony without some positive act of concealment does not make one guilty of this offense.' 'Making a false entry in an account', no, that would't [sic] make it. 'That the accused had knowledge of the actual commission of a felony by another; and that he concealed and did not as soon as possible make known the same to the civil or military authorities. Now that means this: if you had knowledge that a crime was about to be committed and you failed to make it known to the proper authorities, you're guilty as an accessory before the fact. If you have knowledge that a crime has been committed, a felony and you fail to make it known to the proper authorities, you're guilty as an accessory after the fact. This puts you on an even keel with the triggerman my friend. Is this what you want?

"A: nr

"Morrow: Be sure you read the proof.

"(??): Tom, as soon as you're through reading that, I want to talk to you a minute.

"Morrow: Do you understand that?

"A: nr

"Heysel: If you are afraid of any type of subversive type of party getting next to your family there are other agencies in the states other than the Marine Corps Criminal Investigation Section and I can show you, or I can tell you right now, I've been given the authority to—there will be a message drafted by this command and sent out that will place your family in protective custody.

"Morrow: That would be under the FBI.

"Heysel: Or CIA, or whoever this may fall under. You will be fully protected. But we need your cooperation, We will let you see the message.

"Continued questions by Morrow:

"Q: If you want to help yourself, if you want to help your family, you're going to have to come on and tell us about it. I think you understand that. Do you think that they would hesitate to knock you off, huh? And leave you on a garbage pile like they did your friend Stack? Or me or anyone else? Hmmm? As I told you awhile ago, you're not a hardened criminal. You've made a mistake son, that's all. You've got involved with the wrong people, haven't you? Hmmm? Sometimes that's very easy to do, but you can't live with this thing. You're an intelligent person . . . and by your being intelligent you should be able to see the danger you're placing yourself in and your family in right this minute by not telling us who those people are. Can't you understand that? As Heysel had told you, he has spoken to someone who has given him the authority to say that there will be a message drafted immediately . . . even faster than that, it could be a telephone call. That will be done and we certainly can protect you while you're here. Now, who is this man and what did he tell you on the phone on Thursday when he called you? What did he say? Son, we know these pieces so you're not hiding anything from us. What did he say to you on the phone? Did he tell you to get the gun? Hmmm? Is that what he said? Did he say bring the gun in with you? Hmmm? Do you want

**563**

some time to sit and think about this?

"A: oooooooo

"Q: Huh? Just sit there and think about it.

"A: ooooooooo

"Tape editing remark: Interview of Sergeant O'Such suspended for approximately 12 minutes. Interview continues, Sergeant Thomas C. O'Such, U. S. Marine Corps.

"Q: Now are you ready to tell me about this? Let's quit fencing with each other, huh? Get this thing out in the open. If you're afraid for your life we can protect you. We can also protect your family. But.you must tell us about it. You must tell us everything you know. You should name names and places and dates, if you're able to. So just start from the beginning and tell us about it. We'll sit right here and listen to you. We will not interupt [sic] in any way. Is that alright?

"A: nr

"Q: Tell me why the telephone call last Thursday?

"A: nr

"Q: What time was this call?

"A: I believe it was around oooo ooooo 11:30.

"Q: Hmmm?

"A: oooooooo

"Questions by WO Harris:

"Q: Well, son, what makes you think you wouldn't some time in the future? What assurance do you have that you would not in fact die at a later date and not accomplish a thing. And you'd end up just like your friend Stack. Do you have any assurance of this? Now there's one of two things here that are definitely possible and are in fact true. Either you shot Stack yourself, you killed him, you murdered him, or someone that you know did it, because you said yourself that you handled the gun . . . did you not?

"A: Yes, sir.

"Q: This is what Jim tells me and I assume this is true.

"A: ooooooo

"Q: Now, of [sic] this is true, you handled the gun, you give it to someone, you pulled the trigger yourself. In your own mind wouldn't this seem to be true or have to be true?

"A: I didn't pull the trigger. You know I didn't pull the trigger.

. . . . .

"Q: If you provided the gun to him then what assurance do you have at some future date? You know and they know, that at some time you have to be released from jail. What assurance do you have that you won't go walk down the same type of road or take the same type of ride that Stack took? You have no type of assurance do you?

"A: There's no assurance that twenty or thirty years from now that they won't come up and put a god damn round between my eyes, too.

"Q: That's right. You don't have it one way or the other, son, but here's the thing. You got one assurance here not as a definite assurance, but you can at least say this if you take some action now to stop this before it has a chance to grow over a twenty or thirty year period there's a good possibility and I would say it was almost completely probable without any doubt that if you provide the names, that in a short period of time the people who are responsible will all be behind bars. That's your assurance. Now, what is the best chance? What is the best opportunity for you? From looking in your record book, you're a smart boy, there's no doubt about it. You've got way above the average common sense and it's not very hard for you at all to rationalize which is the best opportunity for you. ·And here again is the concern for your family. Let's face it, once you're out of the way there's a possibility that you wrote a letter home and said if anything happens to me do this and name this. So,

564

your family is still not protected. Isn't this true?

"M: Son, you have no protection unless you let us protect you.

"Q: Right about now you're about the most vulnerable person and the longer you sit in that chair and wait and try to rationalize in your mind what to do the more vulnerable you become. Now can't you see that? I think the thing you should do is start from when you first met this man or men which ever the case may be, name some names, all the names you can possibilly [sic] think of that are involved and get the ball on the road. Get it to rolling.

"M: That is for you protection. You can be assured that there won't be any sleeping for any law enforcement agencies on this island until they're in custody.

"H: And it doesn't have to stop at this island ooooo if they're beyond this island oooooo if there's somebody someplace else, now, you know you want to oooooooooo In Japan, the US, Korea . . . any place else oooooo this arm oooooooo

"O'Such: oooooooooooo

"H: oooooooo and you know the longer you wait the harder it will get ooooo and the more jeopardy you place yourself in. And your family in.

"M: It's not so hard at all once you start. Just start from the beginning and tell us oooooooo

"Q: Were you the triggerman, O'Such?
"A: No, I wasn't.

. . . . .

"H: If we start asking questions too fast tell us to slow down.

"Q: Did he tell you to meet him behind the Playboy Bar?
"A: oooooooooooooo fighting ooooo damn self ooooo

"H: That's what I am telling you O'Such. You don't have to fight 'em by yourself. Right now you are. You're sitting there in that chair

fighting by yourself and you aren't doing a dagon bit of good either, because you have nothing to fight with. You're one man.

"M: That's what we get paid for, son.

"H: And the longer you try to fight 'em by yourself the worse off you are. You can realize that, can't you? Look at me, O'Such. You can look at us. I've cried before and I know Jim has so don't feel bad about crying. If you got hooked in this thing the thing to do is push yourself out and push out as fast as you can and pull the people out who pulled you in and pull them out with you and give us the facts and we'll pull them out for you. That's all you've got to do. Give us the names of the people, give us the facts and we'll pull them out for you. Now, when you got this telephone call Thursday, is this when you received the instructions oooo gun oooo ?

"A: oooooooo

"M: Son, look at it this way. Look at me. Do you want to face a murder ooo? Huh? Now, son, I'm not mincing words. I'm not trying to trick you. I ooooo understand ooooooo Now, if you didn't pull that trigger, you must have been standing right next to the man who did. Now, do you want a murder rap on you? Hmmm? That's a pretty stiff sentence. Now you're going to tell us who did this. . . . name names . . . leave none of them out so we can pick them all up. Now, as the gunner told you the long arm of the law doesn't stop at Okinawa. It extends all over this world. Telephone connections in a matter of minutes. oooooo You didn't pull the trigger?

"A: oooo sir. ooooooo

. . . . .

"H: O'Such, I've offered you my advice. Jim's offered you his. It would appear to me that you'd want to protect your own skin and not the skin of your family. It would appear from here that you are the one who pulled the trigger and you

**565**

are making up this story to protect yourself because you don't want any help, from outside.

"M: We know you were on the scene. We know you were there. You were right there when that man was shot. When he was dumped in that ditch. You were the man who took the gun out of the safe. You're the man who put the gun back in the safe. Now, that's pretty air-tight, son.

"Q: Did you shoot him, O'Such?
"A: No.

"(Pounding noises.)

"Q: Who did? Who did shoot him if you didn't? Well, why was he shot? Can you tell me why he was shot?
"A: ooooooooooooooooo

. . . . .

"Q: And you were on the scene. You saw him shot. Didn't you? O'Such? Did they threaten you after they shot him ooooooooo did they threaten you after they shot him?
"A: oooooo have to keep my mouth shut.

"Q: Why do you have to keep your mouth shut? Were you threatened? You can answer this question.
"A: I was told to keep my mouth shut.

"Q: By who? Why were you told to keep your mouth shut?
"A: These people are big. They're a hell of a lot bigger than you think they are.

"H: Alright. Then let's talk about them. You don't know. You know how big they are, but you don't know how big we are, if you're talking about size. So let's talk here and see.

"M: We represent the United States Government. We're pretty big, son.

"O'Such: So is the other one.

"Q: Which other one? Does it hurt that bad to say it, O'Such? Does it hurt that bad to say which other Government, if there is another Government involved? oooooo?
"A: No, but they're pretty damn big, aren't they?

"M & H: You tell us. You tell me, are they?
"A: It seems they are. They've taken over better than half the god damn world.

"Q: How have they done it? By using people like they're using you if this is the case. Now, let's talk this thing out, and stop beating around the bush. Look at me O'Such. Let's get off this kick. You don't like them. You don't want to. I don't like it and I don't want to. Let's discuss this thing in detail. Let's get this thing out and talk about names so we can protect who ever needs to be protected. Now, you know one your friends, a boy you went through Embassy School with has been murdered. Has he not?
"A: Yes, sir.

"Q: And you don't know whether it's going to stop or who's going to be next, do you?
"A: No.

"Q: Alright then, let's start talking. Are you willing? Look at me.
"A: Sir, for Christ sakes, they'll kill my family bigger than shit the minute I open my mouth and one of these people are picked up . . .

"Q: What makes you think they'll kill your family? What makes you think we can't pick them all up at the same time? Now, I'm asking you for names so that I can pick them all up at the same time. I have some of the names that you have . . . had. I'm going to play along with your game ooooo I've got some names that you had in your wallet which you know.
"A: YES, sir.

"Q: Alright. If I go out and pick one of these people up and I don't pick the rest of them up then what you say might happen might happen. Mighten it? And I might just decide to go down and pick one of them tonight just to try and see.

566

I'll guarantee, if you don't start telling me some facts and tell Jim some facts I'm going to start picking them up and I'm going to pick them one at a time because I don't have any reason to pick them all up at one time. Now, if you think this will happen because one person is picked up, then rest assured it may happen, because if I don't get what I want from you then I'm going to get it someplace else. And if it requires going out and picking one up at a time, then I'm going out and pick up one at a time, or Jim is going to pick up one at a time. Is that what you want. It could very easy happen this way. Is this what you want?

"M: Let's look at it this way. We don't have to let anyone know you've said anything to us. We don't have to let anyone know you've said anything to us until we pick them all up . . . until we scoop them all up in one batch. We are not compelled to say anything because we're protecting you. My interest right now is to protect you. If this is in fact what you're afraid of. That's also gunner Harris', but we can't protect you unless we know. As he said, we've got names, we could pick part of them up.

"Q: Alright, O'Such oooooooooo we talked about this thing once and you brought out what harm it could do you. Is that not true? How it's going to hurt you oooo Can you not? O'Such? Now, if you're trying to protect your family you will want them all picked up at once. Is this true? Is it?

"A: Sir, how are you going to arrest the whole god damn Communist Party, ooooooooo just tell me that, will you? How are you going to do it? You can't.

"Q: Who can't do it?
"A: We can . . . . you . . . you could never do it.

"Q: Why?
"A: They're too damn big, that's why. I couldn't give you all the names on this island in hell if I sat here all god damn night I couldn't do it.

"Q: I don't expect you to. I don't expect you to at all. O'Such, what I expect you to do is give us the names of the people who you're involved with. The people who told you to get the weapon ooooooooo. O'Such, all your doing so far is trying to provide an alibi for yourself. If you were really interested in your family and their welfare, son, you'd be talking and when they get word about your family along the same line, they won't protect you and they darn sure don't want to ooooo by themselves. Now if you're in this category, I would suggest that you start talking. What do you think, O'Such?

"Q: What do you think? O'Such?
"A: oooooooooo

"Q: Are you ready to talk this thing out? Now, who called you Thursday?
"A: ooooo

"Q: Did you receive a phone call Thursday?
"A: oooooooooo

"Q: From where?
"A: I don't remember where it was from. I just got oooooooooooooo

"Q: What did they say? What did they say to you?
"A: nr

"Q: This is not jeopardizing anything if you have this stuck back in your mind. What did they say to you? Do they call you Tommy?
"A: oooooo

"Q: What did they call you?
"A: Suchi-san.

"Q: Suchi-san? I'm sorry, what was that again?
"A: Suchi-san."