UNITED STATES

v.

Private E–1 Jessie C. TALAVERA, 586–07–2093, U. S. Army, Company C, Maintenance Battalion, Special Troops, U. S. Army Base Command, Okinawa, APO San Francisco 96248.

CM 431162.

U. S. Army Court of Military Review.

Sentence Adjudged 1 Aug. 1973.

Decided 25 March 1976.

Appellate Counsel for the Accused: CPT Derryl W. Peden, JAGC; CPT Anthony J. Siano, JAGC; LTC Edward S. Adamkewicz, Jr., JAGC; COL Victor A. De Fiori, JAGC.

Appellate Counsel for the United States: CPT Gregory M. Van Doren, JAGC; CPT James R. Anthony, JAGC; MAJ Steven M. Werner, JAGC; LTC Donald W. Hansen, JAGC.

OPINION OF THE COURT

JONES, Senior Judge:

The appellant was convicted of felony murder, robbery (two specifications), aggravated assault, conspiracy, and absence without leave, in violation of Articles 118(4), 122, 128, 81, and 86, Uniform Code of Military Justice, 10 U.S.C. §§ 918(4), 922, 928, 881, and 886. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for life. The convening authority reduced the period of confinement to 25 years, approving the remainder of the sentence. We are reviewing the case pursuant to Article 66, UCMJ, 10 U.S.C. § 866.

On the night of 19–20 January 1973, Lance Corporal William Burkeholder, Corporal Demus Garcia, and Lance Corporal Ted Paquet, all members of the United States Marine Corps, went to the town of Futenma, Okinawa, to make a telephone call. As they were about to enter a drinking establishment, an automobile drove up. The appellant was the driver of the car and a friend of his, later identified as Roy Araneta, was a passenger. The three Marines, after talking with the appellant and Araneta about purchasing marihuana, got into the back seat of the automobile.

The group proceeded to a nearby back road and smoked some marihuana cigarettes. The appellant then drove back to Futenma, dropped off one of the Marines, Paquet, and drove to another isolated area. The appellant and the other two Marines got out of the car and Araneta drove off, ostensibly to obtain some marihuana for the Marines to buy.

When Araneta returned, he got out of the automobile and immediately displayed a pistol. The appellant walked over to Araneta and received the weapon from him. Araneta and the appellant then ordered the Marines to empty their pockets. Burkeholder was also directed to throw his coat on the ground. The Marines complied. Araneta picked up the objects, including $20.00 in currency and Burkeholder's coat.

The two Marines were ordered to lie on the ground. The appellant and Araneta then returned to the automobile; Araneta sat in the driver's seat, the appellant in the passenger's seat. According to the appellant, both in his testimony and in his pretrial statements which were received in evidence, Araneta ordered the appellant to shoot the Marines. The appellant refused. Whereupon the two changed positions in the automobile and the appellant handed the pistol to Araneta. After Araneta fired several shots at the Marines, the appellant and Araneta drove away. Garcia died as a result of the bullet wounds. Burkeholder, who was struck twice, survived.

As a result of this incident, a prior robbery six days earlier, and a lengthy absence without leave during which these events occurred, the appellant was tried, convicted and sentenced as outlined above.

The appellant has raised a number of errors, to include denial of right to speedy trial, involuntary confessions, and impermissibly suggestive pretrial identification.

I—SPEEDY TRIAL

The appellant was placed in military pretrial confinement on 26 February 1973, after being held by the Japanese authorities for 24 days. He was not brought to trial until 12 July 1973, a delay of an additional 136 days. At trial, the appellant moved to dismiss the charges for lack of speedy trial. The military judge denied the motion.

■ The appellant's pretrial confinement in excess of 90 days raised a presumption of a violation of Article 10 of the Code, 10 U.S.C. § 810, placing a heavy burden on the Government to demonstrate diligence. *United States v. Burton*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971). The Government concedes the applicability of *Burton* but contends that it has met its burden as contemplated by *United States v. Marshall*, 22 U.S.C.M.A. 431, 47 C.M.R. 409 (1973).

■ In *Marshall*, the Court of Military Appeals noted:

"Under *Burton*, the Government may still show diligence, despite confinement of

more than 3 months, in such cases as those involving problems found in a war zone or in a foreign country, . . . or those involving serious or complex offenses in which due care requires more than a normal time in marshaling the evidence, or those in which for reasons beyond the control of the prosecution the processing was necessarily delayed." (22 U.S.C.M.A. at 434, 47 C.M.R. at 412; citations omitted).

We are convinced that the Government met its heavy burden of showing diligence. The charges manifestly involved serious and complex offenses requiring "more than the normal time in marshaling the evidence." *United States v. Marshall, supra.* Moreover, the investigation and processing of the charges were made more difficult by virtue of the foreign location which had only recently been returned to the jurisdiction of Japan. Statements had to be procured from the Japanese and translated and witnesses had to be questioned through interpreters. Because of the complexity of the case, a detailed Article 32 investigation lasting 36 days was required. The report of this investigation included the testimony of ten witnesses and an additional 39 exhibits. Likewise, the complexity of the Article 32 investigation and the legal issues that were to be litigated at the trial, to include voluntariness of pretrial statements, sanity of the appellant, and identification of the appellant, explain the delays in the preparation of the pretrial advice and the subsequent preparation for trial. In short, we are satisfied that the Government has demonstrated truly extraordinary circumstances beyond the difficulties usually encountered in the processing of charges and has met its heavy *Burton* burden.

## II—VOLUNTARINESS OF CONFESSIONS

On 2 February 1973, the appellant was arrested by Japanese police authorities for an alleged narcotics violation. He made the first of six statements concerning the robberies and murder on 4 February. Additional statements followed on 5, 9, 10, 12 and 14 February. In the 4 February statement, the appellant denied killing anyone and refused to make a statement about the robbery of 19–20 January. The statements of 5, 9, 10 and 12 February in effect constituted a unified admission relating to the appellant's activities in connection with the 19–20 January robbery and the murder. The 14 February statement related primarily to the 13 January robbery. All statements were taken by the Japanese police without any participation by American authorities. At trial, the military judge admitted all of the statements notwithstanding the defense contention that the statements were involuntary and were taken at a time when he was denied his right to counsel.

The testimony concerning the taking of the confessions, as might be expected, is somewhat in conflict. The appellant testified that he remained in the Japanese jail for about 25 days and was interrogated 20–22 times during that period. These interrogations lasted, by the appellant's testimony, from 1000 hours until 1730, 1800 or 1900 hours, with time out for lunch and short rest periods. The appellant testified that he was sick the first few days and could not eat because he was undergoing heroin withdrawal symptoms. He stated that he did not inform the Japanese authorities of his debilitated condition because he did not want them to know he was a drug user, especially in view of the charges for which he was originally arrested.[1] He did, however, according to his testimony, inform the police at some unspecified time that he was tired and did not want to answer any questions.

The appellant acknowledged that the Japanese police informed him of his right to counsel but stated they turned down his request for military counsel.

---

1. The appellant was released on the narcotics charges on 3 February and immediately rearrested on the robbery-homicide charges.

The appellant also maintained that the Japanese interpreter told him if he did not cooperate and the truth was discovered he would be in more trouble, but that if he confessed the judge would take that into consideration.

The appellant, at various times during his testimony, attempted to explain why he provided statements to the Japanese authorities. These reasons included the length of the interrogations, his sickness due to heroin withdrawal, hunger because he could not eat the food in the jail, and his general desire to get out of the Japanese jail.

█ The Japanese policemen who took the appellant's statements, including the interpreter, all testified at the trial. These witnesses stated that before questioning the appellant they advised him of his right to remain silent and of his right to consult with counsel.[2] During the time that the appellant was in the custody of the Japanese authorities, he was questioned by the police, according to their testimony, for eleven or twelve days, four to six hours each day, with an hour for lunch and a 20–30 minute recess in the afternoon. He was also interrogated by the public prosecutor's office on a "couple of occasions." The witnesses stated that the appellant did not appear to be sick.

The Japanese witnesses denied using any threats, unlawful inducements, or coercion and denied telling the appellant that if he confessed the judge would take that into consideration. None of the Japanese witnesses recalled the appellant's asking to see any lawyer, either military or civilian. One witness, however, testified that even if a suspect had an attorney, he would not have been permitted under Japanese law to be with his client during the interrogation and further that the police were not required to halt an interrogation until an attorney was

provided. The Japanese witnesses admitted that in accordance with Japanese law the interrogators continued to question the appellant after he had indicated a desire to remain silent.

█ It is upon the above conflicting testimony that we must decide the correctness of the military judge's decision on the admissibility of the appellant's statements.

Article 31(d), UCMJ, 10 U.S.C. § 831(d), provides:

"No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial."

This means that to be admissible an appellant's statement must be voluntary. To determine voluntariness we must look at all of the facts and circumstances surrounding the taking of the statement. *United States v. O'Such*, 16 U.S.C.M.A. 537, 37 C.M.R. 157 (1967). Items such as the nature and conditions of the restraint, the physical and mental condition of the appellant, the type, number and length of the questioning sessions, and the advice or lack thereof given to appellant are factors to be weighed in this determination.

█ The nature and conditions of the restraint appear to be no more onerous than other pretrial confinement. Appellant testified he was undergoing withdrawal symptoms but the Japanese police noticed no appearance of illness and the appellant admitted he did not bring this to their attention. There was no indication of physical abuse, unsafe or unsanitary facilities, deprivation of basic needs, or undue harassment. The shocking conditions and activities present in *United States v. O'Such, supra*, are absent here. That appellant may have been having some difficulty with Japanese

---

2. We find it unnecessary to determine whether the advice given the appellant by the Japanese police complied in all respects with the requirements of the United States Constitution and Article 31, UCMJ, as those requirements are not applicable to the foreign police. *See United States v. Swift*, 17 U.S.C.M.A. 227, 38 C.M.R. 25 (1967); *United States v. Grisham*, 4 U.S.C.M.A. 694, 16 C.M.R. 268 (1954); *United States v. Waldrop*, 41 C.M.R. 907 (A.F.C.M.R. 1969), *pet. denied* 41 C.M.R. 403 (1969); *Commonwealth v. Wallace*, 356 Mass. 92, 248 N.E.2d 246 (1969).

food was undoubtedly true, for persons confined often have trouble adjusting to institutional food. To say that these factors have a significant coercive effect, however, in our opinion, is not realistic.

Interrogation itself is not inherently coercive. *See United States v. Moore,* 4 U.S.C. M.A. 482, 16 C.M.R. 56 (1954). The circumstances, conduct and tactics of the interrogation are crucial. The interrogation sessions here were generally longer than are normally observed in military investigations but this was caused primarily by the need to use an interpreter. This necessity could actually have been a benefit to the appellant because it lessened the likelihood of intense questioning and gave the appellant time to think before responding.

The total number of days of confinement and the numerous questioning sessions would appear at first glance to add weight to appellant's contention that his statements were involuntary but we must remember that appellant's initial confession was made on 5 February, two days after he was arrested on the robbery and murder charges. It did not come after 24 days of confinement and many periods of interrogation. The original confession was written in appellant's own hand. He states he would have confessed sooner but for his fear of reprisal from his accomplice. His statement unmistakably shows a suspect who wants to tell his story first, placing the primary blame on another, and thereby hoping to gain leniency for himself. This type of self-imposed coercion does not render a statement involuntary.

The subsequent statements made by the appellant were nothing more than expansions on his original confession. He added a multitude of details, insuring that the culpability of his accomplice was always at the forefront. Of special significance in determining the voluntariness of these detailed statements was the appellant's remark at the end of the statement of 10 February:

> "I will relate later on what we did after that, because we don't have enough time to talk this afternoon."

This is not the remark of a person being coerced into confessing.

One further facet of voluntariness concerns whether appellant was deprived of the effective assistance of counsel. There seems to be no dispute concerning the advice he was given regarding his right to counsel. The dispute centers on whether appellant asked for counsel prior to making his confession. The appellant maintains that he did whereas the Japanese witnesses deny this. We choose, as did the triers of fact who saw and heard the witnesses, to disbelieve the appellant and believe the Japanese police.

Upon consideration of all of the factors discussed above, we are convinced that appellant's statements were voluntary and therefore admissible.

## III—PRETRIAL IDENTIFICATION

Following the incident of 19–20 January, Lance Corporal Burkeholder gave a general description of his assailants to the Japanese police, to include his conclusion that he believed them to be Filipinos.[3] While Burkeholder was in the hospital, the Japanese police showed him a number of pictures. The record is unclear as to the precise number; the estimates ranged from 150 to over 1,000. Burkeholder testified that the third or fourth time he was shown the pictures, he picked out two or three that he identified as the appellant.

The Japanese witnesses, on the other hand, testified that the pictures were shown to Burkeholder only to obtain a composite likeness of the assailants and that Burkeholder identified two or three as resembling the appellant. The appellant's picture was not included at this time. Later, after the appellant had been arrested, his picture was shown to Burkeholder as part of a group of some 17 or 18 pictures. At that time Burkeholder correctly identified the appellant as one of his assailants.

Approximately three weeks after the incident, the Japanese police conducted a line-

---

3. Talavera and Araneta are both natives of Guam.

up at the hospital.[4] Two groups of six or seven persons each were shown to the witness. Burkeholder did not recognize anyone in the first group, but he correctly identified the appellant in the second group. The line-up consisted of both Filipinos and Japanese. There is no indication that the persons conducting the line-up suggested that Burkeholder should identify any particular person. The appellant was not represented by counsel during the line-up or when the photographs were shown to Burkeholder.[5]

Lance Corporal Frederick Alward, the victim of the 13 January robbery, returned to the United States shortly after the incident. He returned to Okinawa sometime the following May, at which time he was shown a group of eight pictures by the Japanese police. Two of the pictures were of the appellant and one was of Araneta. Alward identified all three. He did not view any line-up.

At trial, the defense moved to suppress the in-court identification of the appellant by Burkeholder and Alward, citing impermissibly suggestive pretrial identification. The military judge denied the motion as to each witness on the ground there was an independent basis for the in-court identification aside from any question of pretrial photographs or line-up identification.

The military judge ruled correctly. We do not find the pretrial identification by Burkeholder to have been suggestive. The pretrial identification by Alward is somewhat suspect as the police had included two pictures of the appellant in a group of eight. However, each witness testified at trial that he was able to identify the appellant based on his observation of him at the time of the incident. The evidence amply supports this conclusion and we so find beyond a reasonable doubt.

We have considered the remaining assignment of error concerning the military judge's instruction on felony murder. We find the judge's instructions were proper and sufficient. No further comment or discussion on this matter is necessary.

The findings of guilty and the sentence are affirmed.

Judge DONAHUE concurs.

O'DONNELL, Judge, concurring in part and dissenting in part:

I concur with the majority on the issues of speedy trial and pretrial identification. However, I do not agree that the appellant's pretrial statements were voluntary. I agree generally with the facts set forth by the majority concerning the statements. However, in order to place the legal question in the proper perspective it is appropriate to set forth additional facts bearing on this issue.

As correctly noted by the majority, the testimony concerning the confessions is in conflict in several significant areas. The appellant testified that he was arrested at 0500 hours on 2 February 1973 by the Japanese authorities. On the same afternoon, according to the appellant, he was informed by the Japanese authorities that he had a right to a lawyer. When he attempted to obtain military counsel, however, he was told by Mr. Medoruma, the Japanese interpreter, that he had no such right because he was under Japanese jurisdiction. A similar statement was made to the appellant by a Mr. Eisenstein who was apparently employed by the American authorities in Okinawa. Instead, according to the appellant, Mr. Eisenstein gave the appellant a list of Japanese attorneys. The appellant stated that on the third day following his arrest—presumably 5 February—he indicated that he wished to be represented by Mr. Uechi, one of the lawyers on the list. The request

4. Burkeholder testified that the line-up was conducted after he had identified the appellant from the group of 17–18 photographs. One of the Japanese policemen testified that the line-up preceded this photographic identification. As the policeman was not present at the line-up, we have accepted Burkeholder's version as the correct one.

5. There is no right to counsel at a photographic identification. *United States v. Smith*, 44 C.M.R. 904 (A.C.M.R.1971).

was made before he made his first incriminating statement later on that day. The appellant stated that the Japanese authorities wouldn't permit him to use the telephone to obtain counsel. He did not get to see Mr. Uechi, however, until "after his confession."[1]

The testimony of the Japanese policemen was somewhat vague concerning the appellant's request for counsel. Mr. Ikemuya, the interrogating officer, testified that he did not remember if he advised the appellant of his right to counsel or if the appellant requested counsel. Mr. Medoruma, who acted as interpreter during the interrogations, testified that the appellant was advised of his right to counsel. He testified further that he did not recall if the appellant asked to see a lawyer but he did know that at some unspecified time Mr. Uechi became the appellant's counsel.

Four psychiatrists also testified at the trial—one for the defense, one in rebuttal for the Government, and two who examined the appellant as a result of a court-directed sanity board. The thrust of the psychiatric testimony is that the appellant was legally sane at the time he committed the acts in question. More to the point presently under consideration, however, is that three of these witnesses concluded that because of his passive personality, the appellant's ability to adhere to the right was impaired to a greater or lesser extent. Only the psychiatrist testifying for the Government concluded that the appellant could adhere to the right without impairment. Of particular interest is the conclusion of Dr. Martin Blinder, a civilian psychiatrist who testified for the defense, that the appellant is a "passive, impulse-ridden, psychologically defective and helpless individual, hungry for shreds of recognition and self-esteem and easily led by others either for good or evil."

To be admissible against an accused, a statement must be voluntary. That is to say, it must be the product of free choice.

A statement is not voluntary if it was obtained through coercion, unlawful influence or unlawful inducement or if it was otherwise not the product of the free will of the accused. Article 31(d), Uniform Code of Military Justice, 10 U.S.C. § 831(d).

In determining voluntariness, consideration must be given to the totality of the circumstances surrounding the taking of the questioned statement. *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *United States v. O'Such*, 16 U.S.C.M.A. 537, 37 C.M.R. 157 (1967). Some of the factors taken into account are the duration of the interrogation, e. g., *Stein v. New York*, 346 U.S. 156, 184, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953), *United States v. Houston*, 15 U.S.C.M.A. 239, 245, 35 C.M.R. 211, 217 (1965); the nature of the restraint, e. g., *Chambers v. Florida*, 309 U.S. 227, 238–39, 60 S.Ct. 472, 84 L.Ed. 716 (1943), *United States v. O'Such, supra*; the methods employed by the interrogators, e. g., *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), *United States v. Walker*, 9 U.S.C.M.A. 186, 25 C.M.R. 449 (1958), the physical and mental conditions of the suspect, e. g., *Fikes v. Alabama*, 352 U.S. 191, 197–98, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957), *Stein v. New York, supra*, 346 U.S. at 185, 73 S.Ct. 1077, *United States v. Michaud*, 2 M.J. 428 (A.C.M.R. 20 November 1975); and the presence or absence of counsel, e. g., *Procunier v. Atchley*, 400 U.S. 446, 453, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971), *Crooker v. California*, 357 U.S. 433, 437–38, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958).

Although there is a conflict in the testimony as to the duration of the interrogation, there is no question that the appellant was held in the Japanese jail from 2 to 26 February and that the disputed statements were made between 5 and 14 February. Not only was the appellant incarcerated in a foreign jail, but he was being held incommunicado, without counsel.[2] Moreover,

---

1. The appellant did not specify which confession. It would appear, however, that he was referring to his statement of 5 February.

2. *See Haynes v. Washington*, 373 U.S. 503, 513–15, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963),

there is no indication that while he was being held by the Japanese any formal charges were filed by the civilian authorities.

As with most of the salient issues, the testimony is in conflict with respect to the methods employed by the Japanese interrogators. For example, the Japanese witnesses deny the appellant's contention that he was led to believe he would be accorded leniency if he cooperated. The appellant's testimony in this regard, however, is corroborated to a degree by his handwritten statement of 5 February in which he stated that he was confessing, among other reasons, "so that this killing of a soldier will not put to [sic] much on my sentence when I go to court."

As to several points concerning the methods employed by the Japanese police, however, there is no dispute. Thus, the questioning lasted approximately six hours each day for at least ten days, excluding a recess for lunch and brief breaks in the afternoon. Moreover, the language barrier certainly must be considered in determining the state of mind of the appellant. The interrogator questioned the appellant in Japanese. This was translated into English by another member of the Japanese police force. The appellant answered in English. This in turn was translated orally into Japanese and reduced to writing in Japanese. The written statement, when completed, was then translated back into English for the appellant to sign.

Although the testimony concerning the appellant's physical condition at the time of the statement is in dispute, there is little if any dispute as to his mental condition. He has a passive personality and is easily led by persons with stronger personalities. His ability to adhere to the right is impaired to a greater or lesser extent, according to three of the psychiatrists. While the evidence concerning the appellant's mental condition was offered in the context of his mental responsibility for the acts charged, it has a distinct bearing on whether his

statements to the Japanese authorities were voluntary. As the Supreme Court noted in *Stein v. New York*, 346 U.S. 156, 185, 73 S.Ct. 1077, 1093 (1953):

"The limits [of permissible interrogation] in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal."

Turning finally to the question of counsel, the appellant admits that the Japanese police advised him of his right to remain silent and of his right to a lawyer. Those rights, however, were of little value to the appellant. Under Japanese law—at least as it was applied in this case by the Japanese police—an accused has the right to remain silent only as to particular questions. Accordingly, the police continued questioning the appellant after he refused to answer individual questions—indeed after he initially indicated he wished to make no statement at all. The appellant's right to an attorney was also less than complete. Under Japanese law, the right does not extend to the presence of a lawyer during the interrogation. My reading of the record convinces me that the appellant, although requesting counsel, was denied the services of a lawyer until after he had confessed.

Viewing the totality of the circumstances and evaluating the conflicting testimony, I conclude that the appellant's statements were involuntary. Without isolating any single factor, the essential ingredients leading to this conclusion include the lengthy interrogation of a soldier with a markedly weakened mental condition, conducted incommunicado in a foreign jail; the practice of the interrogators of continued questioning in the face of a desire to remain silent; the belief of the appellant that if he confessed he would obtain leniency; and the denial of the appellant's request for counsel.

and *Chambers v. Florida*, 309 U.S. 227, 239, 60 S.Ct. 472, 84 L.Ed. 716 (1940), for a discussion

of the coercive effect of incommunicado detention.

One further matter requires discussion. The military judge in submitting the question of voluntariness to the jury, did not instruct them on the legal significance of the medical testimony or the effect of a denial of counsel. These matters were in dispute and should have been presented to the jury so that they could make an informed decision as to the voluntariness of the confession. The failure of the judge to do so, in my opinion, constituted reversible error. *See United States v. Keller*, 17 U.S. C.M.A. 507, 38 C.M.R. 305 (1968).

For the reasons discussed in this dissenting opinion, I would reverse and order a rehearing.