UNITED STATES, Appellee,

v.

Jesse C. TALAVERA, Private, U. S. Army, Appellant.

No. 32,362.
CM 431162.

U. S. Court of Military Appeals.

Nov. 5, 1979.

For Appellant: *Captain Derryl W. Peden* (argued); *Colonel Alton H. Harvey, Captain John C. Carr* (on brief); *Lieutenant Colonel John R. Thornock, Captain Michael B. Dinning.*

For Appellee: *Captain Gregory M. Van Doren* (argued); *Colonel Thomas H. Davis, Major John T. Sherwood, Jr., Captain Richard S. Kleager* (on brief); *Lieutenant Colonel Donald W. Hansen, Captain John F. DePue.*

Opinion

COOK, Judge:

The Court granted review and heard argument on three issues. Pending decision, a new mental responsibility standard was promulgated and made applicable to "cases pending appeal." *United States v. Frederick*, 3 M.J. 230, 238 (C.M.A.1977). Accordingly, we added, as a fourth issue, the effect of the change in standard upon the findings of guilty. We conclude that no issue merits reversal of accused's conviction of several offenses in violation of the Uniform Code of Military Justice, including felony murder, and affirm the decision of the United States Army Court of Military Review. 2 M.J. 799 (1976).

Of the three assignments of error upon which we granted review, two deal with pretrial statements by the accused to Japanese police when he was in their custody. One of these challenges admissibility; we agree with the Court of Military Review

that they were properly admitted into evidence. The other assignment is predicated upon remarks in the dissenting opinion in the court below to the effect that the trial judge committed reversible error by not instructing the court members, on his own initiative, as to "the legal significance of the medical testimony or the effect of . . [an alleged] denial of counsel" on the voluntariness of the pretrial statements. *Id.* at 807. We discern nothing in the testimony as to the accused's mental condition to affect his freedom of choice as regards rights he had been informed that he had by the Japanese police.

None of the four psychiatrists who testified regarding accused's mental condition was asked to express an opinion as to the effect of that condition on accused's ability to surrender a known legal right. Dr. Blinder, who testified as a defense witness, stated that under certain circumstances the accused was "uncommonly susceptible" to the influence of "pressures from other individuals from whom he hopes to derive some self-esteem and some respect." Dr. Blinder perceived the leaders that could assert such influence upon the accused as the accused's "peers." The accused's own testimony demonstrates he did not regard the Japanese police who questioned him as peers or role models.

On February 12, Japanese police arrested the accused and a discharged serviceman, Roy Araneta, in an apartment they shared; the arrest was for "drugs." The next day the accused was released, but, immediately, was rearrested for murder and robbery. Araneta had given the police a statement admitting that, on January 20, he and the accused had engaged in the robbery of two servicemen, one of whom, Garcia, had been killed, and the other, Burkeholder, had been wounded, by gun fire. Araneta attributed the shooting to the accused. He had also shown the Japanese police the place where the gun had been thrown away after the shooting, and the weapon was found in a search of the area by the police. The homicide and robbery had been under investigation by the Japanese.

Immediately following accused's second arrest, the police questioned him about the Garcia-Burkeholder crimes. He insisted he had never "possessed any gun" and that he had "never killed anybody." Other than general information on his background, he refused to say anything else. In the days that followed, he changed his position. He admitted participating in the incidents, but he maintained that Araneta had taken the gun from him and had fired the fatal shots.

At trial, the accused testified that he made the incriminatory statements because he was tired and "very sick." He attributed his illness to his inability to "eat the food they were serving" and to his "coming out of the withdrawal from drugs." Under cross-examination, he conceded that, at his first arrest, he had told the Japanese police he had "stopped using drugs." His testimony continued as follows:

Q Why did you tell them that?

A Because when I first got arrested for drugs I didn't have any so I couldn't see how they could charge me with possession, they just probably suspected me of it so I thought I would just keep my mouth shut and try to convince them I was not a drug user.

Q You said you had all these symptoms of going through drug withdrawal, did you make any effort to bring this to the attention of the police concerned?

A No sir, because if I did then they'd know I was a drug user.

Q Did you make these statements voluntarily Jesse?

A Yes sir.

Q Did you make them of your own free will?

A Yes sir.

The trial judge instructed the court members as to their responsibility to determine the voluntariness of the accused's pretrial statements. He fairly summarized the evidence bearing on that issue. We discern no error in his failure to advise the court members to consider the accused's suscepti-

bility to being led by a person regarded by him as a leader as bearing upon whether he voluntarily elected to forego silence and the right to counsel at the interrogations by the Japanese police, which produced the statements admitted into evidence.

Accused's third assignment of error challenges the correctness of the trial judge's denial of a defense motion to dismiss the charges for lack of speedy trial. *See United States v. Burton*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971), as modified by *United States v. Driver*, 23 U.S.C.M.A. 243, 49 C.M.R. 376 (1974). We conclude that ruling was correct.

 Before explicating the facts, two matters merit mention. The first is the principle that, as regards speedy disposition of a charge, where there are multiple specifications, the proceedings as to each must be considered separately. *United States v. Marell*, 23 U.S.C.M.A. 240, 49 C.M.R. 373 (1974); *United States v. Mladjen*, 19 U.S.C. M.A. 159, 41 C.M.R. 159 (1969). Here, there are two separate charge sheets, one dated February 28 and the other dated March 27. The accused was confined by American military authorities on February 26. The record manifests that the confinement was for the offenses set out in the first charge sheet, which included the Garcia murder and two specifications alleging drug transactions. The second charge sheet alleged the robbery of a Marine named Alward. As the accused was in confinement when charged with the Alward's offense, the beginning date of the period that would measure whether the Government was tardy in bringing that offense to trial was not necessarily the date of imposition of confinement but, "when the Government had in its possession substantial information on which to base the preference" of that charge. *United States v. Johnson*, 23 U.S.C.M.A. 91, 93, 48 C.M.R. 599, 601 (1974). The parties have not addressed this question. The failure to do so does not preclude the Court from doing it, but our conclusion as to the lack of merit in the accused's claim makes that unnecessary.

The second matter that requires preliminary comment is integral to accused's claim of error. It is apparent from the opinion of the Court of Military Review that, in reaching its decision affirming the trial judge's ruling, it considered matters appearing in the record of the Article 32, 10 U.S.C. § 832, investigation. In this Court, appellate defense counsel contend that the Article 32 record cannot properly be considered because it was not before the trial judge during the motion to dismiss. *See United States v. Amundson*, 23 U.S.C.M.A. 308, 312 n. 5, 49 C.M.R. 598, 602 (1977).

The record of trial indicates that during the proceedings on the motion to dismiss, government counsel referred to the extensive nature of the Article 32 and asked the trial judge to take judicial notice of it. He argued that the "coupling" of the Article 32 record with a stipulated chronology that had been admitted into evidence established that the proceedings had been timely. Asked for his views on the issue, defense counsel rested "on the facts that have already been presented"; he made no objection to, or comment on, trial counsel's request that the trial judge take note of the Article 32 record. The judge denied the motion, without indicating whether he had or had not taken notice of the Article 32 record. In his post-trial review, the staff judge advocate did not discuss the import of the trial counsel's request, but he referred to several particulars in the Article 32 report as evidence of excusable delay.

 Before the Court of Military Review, accused's counsel challenged the correctness of the trial judge's ruling. He did not, however, dispute that the record of the Article 32 could be considered on the issue. Counsel acknowledged that the pretrial proceedings "entailed a lengthy Article 32 investigation," but he argued that "however diligently it may have been conducted," it did not "invalidate appellant's claim under the *Burton* rule." In these circumstances, we are persuaded that we can properly look to the Article 32 record as part of the Government's justification of the time required to bring the accused to trial. *Cf.*

*United States v. Santiago-Vargas*, 5 M.J. 41, 42 (C.M.A.1978).

■ Accused was confined on February 26 and brought to trial on July 13. As the elapsed period is 136 days, the so-called *Burton* presumption of prejudice by the delay is facially operative. The presumption is, however, rebuttable by evidence that matters "beyond the control of the prosecution" extended the delay past 90 days. *United States v. Marshall*, 22 U.S.C.M.A. 431, 434, 47 C.M.R. 409, 412 (1973); *see United States v. Herron*, 4 M.J. 30 (C.M.A. 1977); *United States v. Cole*, 3 M.J. 220 (C.M.A.1977); *United States v. Johnson*, 3 M.J. 143, 149 (C.M.A.1977).

■ To date, the Court has consistently held that the prosecution is not chargeable with periods of time included in an Article 32 investigation that result from circumstances not attributable to it. *United States v. Roman*, 5 M.J. 385, 388 (C.M.A. 1978); *see also United States v. Herron, supra*. Reflection on the purposes of an Article 32 investigation and its characterization as a "judicial" proceeding, which must be scrupulously free from prosecutorial influence (*see United States v. Collins*, 6 M.J. 256 (C.M.A.1979); *United States v. Payne* 3 M.J. 354 (C.M.A.1977)), raises doubt that the prosecution should be charged even with the "normal" time for the investigation. *See United States v. Beach*, 1 M.J. 118, 119 (C.M.A.1975) (Cook, J., dissenting); *compare* Judge Perry's opinion in *United States v. Cole, supra* at 225 n. 4 *with* Chief Judge Fletcher's opinion in *United States v. Roman, supra* at 389. We have, however, put aside those doubts, and start with the concept that all Article 32 time is chargeable to the Government, unless it can establish that one or more portions thereof are excludable because the "attendant circumstances" were such that more time than "normal" was required for each part. *United States v. Cole, supra* at 227.

■ Of the time required to complete the Article 32, at least three periods are, in our opinion, not chargeable to the prosecution.

1. The Article 32 report indicates that hearing sessions were held on five days, with the first on March 29 and the last on April 11. The investigating officer reported that some hearings "were scheduled according to the availability of . . counsel." Shared responsibility for a delay is not chargeable to the prosecution. *See* my separate opinions in *United States v. Cole, supra* at 229; *United States v. Driver, supra*, 23 U.S.C.M.A. at 245, 49 C.M.R. at 378. The investigating officer did not particularize which of the hearing sessions resulted from shared responsibility. However, several circumstances, especially the fact that the first session was held long after expiration of the 72 hours prescribed for the investigation in the order of appointment, convince us that the first session resulted from the agreement of counsel as to their joint availability. Consequently, the period of 6 days from March 23, the day the investigating officer received his file, and March 29, the day of the first session, is excludable from the prosecution's time of accountability.

2. The Article 32 officer noted in his report that the Japanese authorities required "seven days notice" to secure the attendance of a local national as a witness. Several important witnesses were local nationals. The investigating officer recorded that the Japanese witnesses were "scheduled" for a hearing session on April 5, but they "were unable to appear" and the "hearing on 11 April was necessary." In our opinion, at least, the period of 6 days from April 5 to April 11 is excludable from the period of accountable delay.

3. The accused acknowledges that the Article 32 was "extensive." The investigating officer recorded a number of difficulties he encountered in the course of the investigation. Putting all these aside, we believe that no one reading the record of the proceedings could reasonably deny that the preparation of the report required intensive and extended effort. The investigating officer held his last hearing on April 11; responding to a

defense contention that the evidence of the drug offenses was insufficient, he attempted to locate additional statements that had purportedly been given by the accused to the Japanese police. His efforts were unsuccessful, and on April 17 he notified counsel he had closed the record for further evidence. On April 24, he submitted his final report. That some part of this time should not be counted in the computation seems to be incontestable. Precise calculation is unnecessary. We are certain that the matter demanded of the investigating officer at least one more day of effort than what might reasonably be held to be "normal."

Added to the above is a period of exclusion that is justified by a combination of events after the charges had been referred to trial. Endorsements on the charge sheets, which were before the trial judge prior to the motion to dismiss, indicate that the charges were originally referred on June 1, to a court-martial appointed by Court-Martial Convening Order No. 3, and were rereferred, on July 3, to a court appointed by Court-Martial Convening Order No. 24. As indicated in the evidence relating to a later motion by the defense challenging the court panel, the trial judge and both counsel knew that under the court-martial system in the command, a general court-martial served for a period of six months and that the term of the Convening Order No. 3 court expired on June 30. The stipulated chronology shows that the accused retained civilian counsel "ON OR ABOUT 10 June 1973" and that on June 12 the defense presented a motion addressed to the drug offenses set out in the original charge sheet.

It reasonably appears that all persons concerned with the case anticipated, from the scope and the detail of the Article 32 and the evidentiary conflicts posited in it, that the trial would be lengthy.[1] The appearance of new counsel and the interposition of the defense motion assured that the case could not be tried by the court to which it had been referred on June 1, within the time remaining on its term. Unless the term system was compromised, and the court members and their respective units were subjected to the burdens of service beyond the established period, the late entry of new defense counsel and the new action taken by the defense patently necessitated postponement of trial to a time when a new court could be appointed and a date of trial arranged. As the prosecution had no control over these events, the delay precipitated as a result of them was not chargeable to it. Consequently, the 33-day period from June 11[2] to July 13 is excludable from its time of accountability. *See United States v. Cole, supra* at 227 (Cook, J., concurring in result). Adding this period to the 13 days excludable from the Article 32 period results in a total exclusion of 46 days.

 Subtracting 46 days from the 136-day period between confinement and trial leaves a remainder of 90 days, a period not sufficient to give rise to the *Burton* presumption. Viewing the entire course of the proceedings without a presumption of prejudice convinces us that, if some steps in the course of bringing the charges to trial were less expeditious than they should have been, the accused was not prejudiced by the delay they occasioned.

 Turning to the effect of the change in the standard of mental responsibility for criminal conduct, it is important to observe first that a case tried under the previous standard is not subject to automatic reversal; instead, the appellate tribunal is bound to determine whether use of the standard in effect at the trial entailed "a fair risk of prejudice" to the accused. *United States v. Frederick, supra* at 238. As we read the

---

1. The trial encompassed 8 court days, extending from July 12 through August 1.

2. The stipulated chronology indicates that new defense counsel was retained "ON OR ABOUT 10 June 1973." As June 10 was a Sunday, it is unlikely that counsel entered the case on that day. Since responsibility for establishing an exclusion rests upon the Government, we have selected the next work day as the beginning of the excludable delay.

record, we are convinced the accused "would not have benefited from the change in the standard of mental responsibility," and, therefore, we do not reverse his conviction because of the intervening change. *United States v. Bledsoe*, 5 M.J. 371 (C.M.A. 1978); *see also United States v. Roman, supra.*

Four psychiatrists testified as to the accused's mental state at the time of the offenses. Each doctor considered essentially the same family, social and military background of the accused, and each had a single interview with him which was deemed sufficient for the psychiatric evaluation. Dr. Blinder, the accused's witness, saw the accused for about one and one-half to one and three-quarter hours; Dr. Howard, who first evaluated the accused, saw him for about one hour; Dr. Chaudhri's session was about two and one-half hours; and that of Dr. Cooperman was approximately three hours. All doctors agreed the accused could distinguish between right and wrong. As to whether the accused could "adhere to the right," Dr. Howard responded with an unqualified "Yes." Dr. Chaudhri stated that, while the accused suffered from no mental disease or defect, he thought the accused's ability to adhere to the right was "mildly impaired because of his background of poor social and economic status and lack of affection." Dr. Cooperman believed the accused "had a mild impairment to adhere to the right" because of "certain factors from his family upbringing and his social and economic environment in which he grew up." As the stated level of impairment is so low, it would be insufficient to require an instruction, even under the new standard, which is that, because of mental disease or defect the accused " 'lacks substantial capacity . . . to conform his conduct to the requirements of law.' " *United States v. Frederick, supra* at 234, 238. Consequently, whether any instruction was required, and whether, if required, the one given prejudiced the accused, depended upon the testimony of Dr. Blinder.

Dr. Blinder testified the accused "wasn't crazy in the lay sense of the word"; that he had "no disturbance or evidence of brain disease or any acute psychotic process," but he was "a passive, impulse-ridden, psychologically defective and helpless individual, hungry for shreds of recognition and self-esteem and easily led by others either for good or evil." He characterized this condition as mental "derangement." The effect of this condition on the accused's ability to adhere to the right was stated in several ways. At one point, responding to a direct question as to whether the accused could refrain from doing what he knew was wrong, Dr. Blinder said he thought that in "most instances" the accused could, but "under certain circumstances, given certain kinds of pressures, particularly peer pressures from certain kinds of charismatic positions, . . . it would be very very difficult for him to adhere to what he, positively speaking, knows to be right." At another, he summarized his opinion as to the influence on accused's conduct of his "many ego and superego defects" as follows:

> [W]hat that means in simple language is that he is damaged goods. He has been damaged since he was a kid and when he is under stress, I do not see him equal to the mental processes necessary to conform his behavior to the requirements of the law.

In his closing argument to the court members, defense counsel repeated verbatim the above quotation from Dr. Blinder. Counsel then remarked that the only real difference among the doctors "centered around the degree of impairment" of accused's ability to adhere to the right. He maintained that the military psychiatrists had to be inhibited in their development of a "full opinion" by the "constraints" of a joint service publication on psychiatry,[3] while Dr. Blinder was wholly free of them. He argued that "Dr. Blinder told us . . . that given this antisocial personality . . [of the accused] and then placing . . .

---

**3.** Psychiatry in Military Law, Department of the Army, Technical Manual 1–240; Department of the Air Force, AFM 160–42; Department of the Navy, NAVMEDP–5105.

[him] in certain circumstances, he is not mentally or legally responsible for his actions."

The medical testimony and counsel's argument make clear that to absolve the accused from responsibility for the crimes charged, the court members had to accept Dr. Blinder's opinion over those of the other doctors. Dr. Blinder's opinion was that accused's mental processes were not equal to those "necessary to conform his behavior to the requirements of the law." In returning a verdict of guilty, the court members obviously did not accept Dr. Blinder's opinion as to the degree of accused's inability to adhere to the right. The necessity to choose between Dr. Blinder and the three other psychiatrists would have been present even if the new legal standard had been used. On this record, therefore, use of the old standard was not prejudicial to the accused.

The decision of the Court of Military Review·is affirmed.

FLETCHER, Chief Judge (concurring in the result):

I concur in the result reached by Judge Cook.

I cannot agree with his mathematical approach to the *Burton*[1] issue. I echo my thinking set forth in my opinion in *United States v. Roman*, 5 M.J. 385, 389 (C.M.A. 1978): "Speedy trial is never a matter of mere mathematics, whether the total falls short of or exceeds an arbitrary magic figure." My reading of this record does not disclose any lack of diligence on the part of the Government to bring the accused to trial.

Looking at the *Frederick*[2] question, I find, upon studying all the evidence, that I cannot find as a matter of law that there was a fair risk of prejudice to the appellant by the use of the standard of mental responsibility set forth in the trial judge's instructions.[3]

PERRY,* Judge (dissenting):

The appellant was convicted by a general court-martial with members of felony murder, robbery (two specifications), conspiracy to commit robbery, aggravated assault, and absence without leave, in violation of Articles 118(4), 122, 81, 128, and 86, Uniform Code of Military Justice, 10 U.S.C. §§ 918(4), 922, 881, 928, and 886, respectively. He was sentenced to a dishonorable discharge, confinement at hard labor for life, and forfeiture of all pay and allowances. The convening authority reduced the period of confinement. to 25 years, but in all other respects he approved the findings and the sentence. His action was affirmed by the United States Army Court of Military Review. 2 M.J. 799 (1976).

During the trial, the appellant contested his legal responsibility for the charged offenses on the basis that he was, at the time of their alleged commission, legally insane. Four psychiatrists testified on this issue. Dr. Martin Blinder, a witness for the defense, testified at substantial length about the appellant's emotional and psychological makeup and about the appellant's background leading to this makeup. He concluded that the appellant was "psychologically defective" and that he did "not see him [the appellant] equal to the mental processes necessary to conform his behavior to the requirements of the law." When the appellant's attorney read to Dr. Blinder a legal definition of "mental defect," the witness responded that that was what he meant when he said the appellant suffered from a mental defect.[1] Further, Dr. Blind-

1. *United States v. Burton*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971).

2. *United States v. Frederick*, 3 M.J. 230 (C.M.A. 1977).

3. *United States v. Frederick, supra* at 238.

* Judge Matthew J. Perry took final action in this case prior to his resignation as a judge of this

Court pursuant to his appointment and confirmation as a United States District Judge for the District of South Carolina.

1. Q [by defense counsel] Then right here, one thing further because we always have a little difficulty between the legal and medical field, but for·our purposes in the law here we have the following definition, (reading): "The

er opined that it would be "very difficult" for the appellant to adhere to the right under conditions where there is "peer pressure from certain kinds of charismatic positions."[2] He explained that he did not mean that the appellant *could* not adhere to the right; only "that his ability to adhere to the right in certain well-defined circumstances . . . is grossly impaired." Dr. Blinder repeated this conclusion of gross impairment several times during his testimony.

The prosecution countered with three psychiatrists—Dr. Dale Howard, Dr. Nonihal Chaudhri, and Dr. Elliot Cooperman. The testimony of these three doctors differed somewhat from that of Dr. Blinder, and among each other as well. Dr. Howard indicated that he diagnosed the appellant as an "antisocial personality" who had no mental defect and no impairment in his ability to adhere to the right. Next, Dr. Chaudhri stated that he, too, believed the appellant to be an "antisocial personality" and that he did not believe the appellant suffered from any mental defect, though he conceded that another psychiatrist could conclude that the appellant did suffer from such a malady. Additionally, he concluded that the appellant's ability to adhere to the right was "mildly impaired." Finally, Dr. Cooperman agreed that the appellant was an "antisocial personality" but asserted that the appellant *was* suffering from a mental defect and that his ability to adhere to the right was mildly impaired as a result.

To guide the court members in applying this testimony to the concept of the appellant's mental responsibility, the trial judge delivered the following instruction, *inter alia*:

> A person is not mentally responsible, in a criminal sense, for an offense unless he was, at the time of the offense, so far free from mental defect, disease, or derangement as to be able concerning the particular act or acts charged both to distinguish right from wrong and to adhere to the right. The phrase "mental defect, disease or derangement" comprehends those irrational states of mind which are the result of deterioration, destruction, or malfunction of the mental, as distinguished from the moral faculties. To constitute lack of mental responsibility, the impairment must not only be the result of mental defect, disease or derangement but must also completely deprive the accused of his ability to distinguish right from wrong or to adhere to the right as to the acts charged.

This standard for mental responsibility is commonly referred to as the M'Naghten[3] standard with the addition of the irresistible impulse test. That standard, and the judge's instructions, reflected the law of insanity as it existed in the military at the time of the appellant's trial.[4] However, in *United States v. Frederick*, 3 M.J. 230 (C.M. A.1977), this Court rejected that standard in favor of the more enlightened definition of insanity recommended by the American Law Institute (ALI):[5]

---

phrase 'mental defect, disease, or derangement' comprehends those irrational states of mind which are the result of deterioration, destruction, or malfunction of the mental faculties." In your use of mental defect, do you mean it to be within that definition?

A Yes.

The defense counsel, of course, was reading from paragraph 120*b*, Manual for Courts-Martial, United States, 1969 [Revised edition].

2. The violent crimes at issue were allegedly committed along with another soldier who, apparently, at the completion of one of the robberies took the weapon used in the robbery from the appellant because the latter could not fire it as the former had directed, and fired repeated rounds into their robbery victims as the appellant and his cohort fled in an automo-

bile. Dr. Blinder testified that the appellant's difficulty in adhering to the right arose either in the absence of a "good" model for him to follow or in the presence of a particularly charismatic "bad" model. Specifically, the defense position at trial was that the other soldier's personality compellingly overwhelmed the appellant's ability to adhere to the right at the time of the commission of the offenses charged.

3. M'Naghten's Case, 10 Cl. & F. 200, 8 Eng. Rep. 718 (H.L.1843).

4. *See* para. 120*b*, Manual, *supra*.

5. Model Penal Code § 4.01, Proposed Official Draft (May 4, 1962).

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(2) As used in this Article, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

As may readily be seen, the primary difference between the two standards, as relevant to this case, is the *degree* of the incapacity to adhere to the right. While the former test and the judge's instructions require that the defect "completely deprive" the appellant of such capacity, the newly adopted one requires only that the defect deprive the appellant of the "substantial capacity" to do so in order legally to be insane and not criminally responsible for his misconduct.

This difference requires that we examine the present record "to determine if there is a fair risk of prejudice to the appellant from the use of the rejected standard of mental responsibility." *United States v. Frederick, supra* at 238.[6] While there was conflicting testimony at the appellant's trial regarding whether the appellant was afflicted with a mental defect, there was *no* testimony that such a defect, if one existed, completely deprived the appellant of the ability to adhere to the right, as opposed to *substantially* doing so. We do not know *why* the court members rejected the appellant's insanity defense, only that it did so. It may have been because it concluded that there was no mental defect, but it is just as plausible that it was because of the total absence of any evidence that the defect completely deprived the appellant of the ability to adhere to the right. If it was the latter, then consideration of the testimony as summarized earlier in this opinion in light of the newly adopted standard might well have led to a different conclusion.[7] Under these circumstances, I determine that the appellant was prejudiced.

I would reverse the decision of the United States Army Court of Military Review, set aside the findings and the sentence, and authorize a rehearing.[8]

6. The ALI standard is to be applied to all cases pending appeal at the time of the *Frederick* decision and to all cases tried subsequent to the date of that decision.

7. This is the key to the resolution of this case. Judge Cook concludes that "[i]n returning a verdict of guilty, the court members obviously did not accept Dr. Blinder's opinion as to the degree of accused's inability to adhere to the right." In fact, it means no such thing for, in point of law, *no* testimony—*including* Dr. Blinder's—suggested a *total* inability to adhere to the right. In other words, *if* Dr. Blinder had been believed, under the standard applied by the members, the conclusion still was inescapable that the appellant was mentally responsible; on the other hand, again assuming acceptance of Dr. Blinder's testimony, under the *new* standard, a finding of irresponsibility might well have obtained. And that is the crux:

there is a fair risk that under the new standard, there may have been different result.

8. Though I disassociate myself from that portion of the lead opinion treating the issue, I join in rejecting the appellant's claim that he was denied a speedy trial, concluding that the presumption of such a denial, which arose by the passage of more than 90 days between the date when appellant was placed in pretrial confinement and the date trial began, *United States v. Burton*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971), is rebutted in the record. Additionally, I assume that at a rehearing the defense again would litigate the voluntariness of the appellant's extrajudicial confessions and that the judge properly would tailor his instructions on that issue to include as a factor for the court's consideration the appellant's mental condition at the time of the interrogation; therefore, I do not now address the appellant's claims of error in these areas.